WATER QUALITY ASSOCIATION EMPLOYEES' BENEFIT CORP., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 83 C 6048.

United States District Court, N.D. Illinois, E.D.

March 28, 1985.

Robert E. Arroyo of Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Terri E. Shapiro, Dept. of Justice, Washington, D.C., Edward J. Moran, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action for a refund of federal taxes, brought pursuant to 28 U.S.C. § 1346(a), is before the court on the cross-motions for summary judgment of plaintiff Water Quality Association Employees' Benefit Corporation ("the Corporation") and defendant United States of America. In this action, the Corporation claims entitlement to a tax refund for taxes paid in 1981 by it and its predecessor, the Water Quality Employees' Benefit Trust ("the Trust"). At issue on these motions is the validity of Treas.Reg. § 1.501(c)(9)–2(a)(1). Should the regulation be found valid, full summary judgment in favor of the government will be warranted. If the regulation is found invalid, however, the Corporation will need to show other facts before prevailing. Hence, the Corporation's motion for summary judgment is in the nature of a motion for partial summary judgment.

## FACTUAL BACKGROUND

The parties agree to the following facts: The Water Quality Association ("WQA") was founded nearly thirty years ago and is composed of retailers, distributors, suppliers, and manufacturers of point-of-use water conditioning equipment, such as water softeners. WQA's members are scattered throughout the United States. WQA is a trade association exempt from federal income taxation under 26 U.S.C. § 501(c)(6).

Since each WQA member has on the average of five employees, it was expensive for each member to obtain insurance for its employees. Consequently, WQA established the Trust so that its members could pool their limited insurance premiums and thereby decrease the cost of insurance while increasing the insurance protection for the member employees. An insurance company was appointed to underwrite the joint purchase of group life and health insurance as well as disability income insurance for WQA member employees and their dependents. The Trust itself has never underwritten the insurance coverage for trust participants, but rather has acted as a conduit, collecting contributions from WQA member participants and paying those contributions to the insurance company as insurance premiums. Only WQA members and their employees were allowed to participate in the Trust.

Over the years, the members benefitted from the underwriting of such a large and homogeneous group. By 1981, over 3,000 individuals were insured through the program. The Trust paid dividends to participants when the insurance company's claims and expenses were less than anticipated. Additionally, a portion of the insurance refunds were retained by the Trust and were used to establish a reserve to pay off deficits when they occurred.

Since the trust agreement was drafted to provide for payments only to trust beneficiaries and for necessary administrative expenses, the Trust applied for a federal income tax exemption under 26 U.S.C.

§ 501(c)(9).[1] Section 501(c)(9) allows an exemption for a "voluntary employees' beneficiary association" ("VEBA") established to provide certain insurance benefits. In 1977, the Internal Revenue Service granted the exemption. At that time, the exemption for the Trust was well within the proposed Treasury Regulation defining the scope of VEBAs.[2] On August 1, 1981, the Trust transferred the insurance plan and its assets to the Corporation, which operates the insurance program in exactly the same manner as did the Trust.

The Corporation claims that it, like the Trust, is entitled to the tax exemption provided by § 501(c)(9) since, like the Trust, it is a "voluntary employees' beneficiary association." However, on July 17, 1980, the proposed regulation discussed above was withdrawn and on January 8, 1981, a final regulation defining VEBAs was published containing a "same geographic locale" limitation that the parties agree renders the Corporation ineligible for the exemption.[3]

The principal difference between the 1969 proposed regulation (in effect for 12 years) and the 1981 final regulation is the requirement that when employees from employers in the same line of business desire to form a VEBA, the employers must be located in the "same geographic locale."

1. Section 501(c)(9) reads in full as follows:
   Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual.

2. Section 1.501(c)(9)-1(b)(1) of the Treasury Department's Proposed Regulations, published on January 23, 1969, reads in part as follows:
   An organization described in section 501(c)(9) must be composed of individuals who are entitled to participate in the association by reason of their status as employees who are members of a common working unit. The members of a common working unit include, for example, the employees of a single employer, the employees of one industry, or the members of one labor union.

3. Section 1.501(c)(9)-2(a)(1) of the Final Treasury Regulations, published on January 7, 1981, reads in part as follows:

The Corporation admits that its member employers are not located in the same geographic locale. Hence, if the final regulation is found valid, full summary judgment in the government's favor would be warranted.

## LEGAL DISCUSSION

The question before the court, one of first impression, is whether Treas.Reg. § 1.501(c)(9)-2(a)(1) effectuates the congressional intent of 26 U.S.C. § 501(c)(9). The Internal Revenue Commissioner's power to prescribe regulations

> is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this but operates to create a rule out of harmony with a statute is a mere nullity.

*Manhattan Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936), *quoting, Lynch v. Tilden Produce Co.*, 265 U.S. 315, 320–22, 44 S.Ct. 488, 489–90, 68 L.Ed. 1034 (1924); *Miller v. United States*, 294 U.S. 435, 439–40, 55 S.Ct. 440, 441–42, 79 L.Ed. 977 (1935). In *Manhattan Co.*, the Court upheld an

> The membership of an organization described in section 501(c)(9) must consist of individuals who become entitled to participate by reason of their being employees and whose eligibility for membership is defined by reference to objective standards that constitute an *employment-related common bond* among such individuals. Typically, those eligible for membership in an organization described in Section 501(c)(9) are defined by reference to a common employer (or affiliated employers), to coverage under one or more *collective bargaining agreements* (with respect to benefits provided by reason of such agreement(s)), to membership in a labor union, or to membership in one or more locals of a national or international labor union * *. In addition, employees of one or more employers engaged in the same line of business in the *same geographic locale* will be considered to share an employment-related bond for purposes of an organization through which their employers provide benefits. [Emphasis added.]

amended regulation as effectuating the legislative intent, where the original regulation was "contrary to the intent of the statute." *Id.* 297 U.S. at 134, 56 S.Ct. at 399. In the present case, the court must similarly determine whether the "same geographic locale" requirement of Treas. Reg. § 1.501(c)(9)–2(a)(1) effectuates the original congressional intent of 26 U.S.C. § 501(c)(9), or whether it impermissibly exceeds the scope of that provision by adding "something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957).

In determining the validity of a Treasury Regulation, courts have relied on the criteria set forth in *National Muffler Dealers Association v. United States*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979). *See e.g., Strick Corp. v. United States*, 714 F.2d 1194, 1197 (3d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984); *Max Sobel Wholesale Liquors v. Commissioner*, 630 F.2d 670, 672 (9th Cir.1980).

In *National Muffler*, the Supreme Court considered whether the petitioner was a "business league" within the meaning of 26 U.S.C. § 501(c)(6). The National Muffler Dealers Association claimed that it was a "business league" entitled to tax exempt status. Since the term "business league" had no common definition outside the scope of Treas. Reg. § 1.501(c)(6)–1, the Court determined that the Treasury Regulation "if found 'to implement the congressional mandate in some reasonable manner' must be upheld." *National Muffler*, 440 U.S. at 476, 99 S.Ct. at 1306, *quoting, United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). This approach recognizes that Congress has delegated to the Secretary of the Treasury and the Commissioner of the IRS, and not to the courts, the task of prescribing all rules and regulations for enforcing the Internal Revenue Code. Among other things, this deference guarantees that rules are written by "masters of the subject" who are responsible for putting the rules into effect. *National Muffler*, 440 U.S. at 477, 99 S.Ct. at 1307, *quoting, Unit-*

*ed States v. Moore*, 5 Otto 760, 763, 95 U.S. 760, 763, 24 L.Ed. 588 (1878).

The *National Muffler* Court made clear that the central inquiry in determining the validity of a regulation was whether it "carrie[d] out the congressional mandate in a proper manner." 440 U.S. at 477, 99 S.Ct. at 1307. In making that determination, the Court continued,

we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute.

*Id.* In considering these factors, courts should keep in mind that the Commissioner is the one empowered to makes choices among various reasonable and permissible statutory interpretations. *Id.* at 488, 99 S.Ct. at 1312. When the Commissioner's regulation implements the congressional intent behind a provision in "some reasonable manner," courts are not at liberty to strike down the regulation simply because the taxpayer offers a more attractive statutory interpretation. Rather, Treasury Regulations are normally sustained "unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948) (cited in *United States v. Cartwright*, 411 U.S. at 557, 93 S.Ct. at 1719).

In *National Muffler*, the Court upheld the Treasury Regulation in question. In reaching that conclusion, the Court looked at statements submitted in 1913 to the Senate Finance Committee, which drafted the

statute which the regulation sought to interpret. Those statements rejected tax-exempt status for organizations like the National Muffler Association. The Supreme Court noted that, while the initial regulation of 1919 could have included appellant, the 1929 regulation made clear that it did not fall within § 501(c)(6). The regulation was viewed as reasonable by the Court, as it simply looked to other enumerated examples of exempt institutions to determine the meaning of "business league." The Court referred to the admittedly unexplained change in the regulation by noting that

the change in 1929 incorporated an interpretation thought necessary to match the statute's construction to the original congressional intent. We would be reluctant to adopt the rigid view that an agency may not alter its interpretation in light of administrative experience.

440 U.S. at 486, 99 S.Ct. at 1311. The Court noted further that since 1929, the regulation remained unchanged, despite several reenactments and one amendment of the statute. *Id.* at 482, 99 S.Ct. at 1309.

The *National Muffler* Court grappled with the definition of "business league." In the present case, the court must consider the meaning of "voluntary employees' beneficiary association." The Supreme Court was guided in its decision by statutory language and legislative history that provided a reasonable basis for the Commissioner's regulation. Here, as is revealed by the discussion below, these guides are less clear. Moreover, neither the proposed nor the final regulation can be characterized as a contemporaneous construction entitled to "particular force."

The statutory provision itself refers simply to "voluntary employees' beneficiary associations." Alone, the phrase does not support any geographical limitation, hence the 1969 regulation, which defines a § 501(c)(9) VEBA as members of a "common working unit" such as a "single em-

ployer, the employees of one industry, or the members of one labor union." The absence of a geographical limitation should be contrasted with the inclusion of such a limitation in § 501(c)(4) ("local associations of employees"), § 501(c)(11) (retirement funds of "a purely local character"), and § 501(c)(12) ("[b]enevolent life insurance associations of a purely local character"). These provisions suggest that Congress expressly excluded the geographical limitation in § 501(c)(9). However, as is discussed below, the "same geographic locale" limitation does not apply to all VEBAs and hence does not serve to add a term otherwise missing in § 501(c)(9).

The legislative history of § 501(c)(9) is ambiguous. The predecessor to § 501(c)(9) was enacted in 1928. Revenue Act of 1928, § 103(16), 45 Stat. 814. The court agrees with the Corporation that since that passage, Congress has acted to liberalize the definition of VEBAs. For example, in 1942, Congress allowed both employer and employee contributions to be counted toward satisfying the then-applicable 85% requirement. In 1969, Congress eliminated the 85% requirement[4] and combined § 501(c)(9) and (10). At that time, § 501(c)(10) allowed tax exemptions to VEBAs consisting of officers and employees of the United States. Congress recognized that after the elimination of the 85% requirement in § 501(c)(9), not included at any time in subsection (c)(10), subsection (c)(10) became in fact a subset of (c)(9), and the two could be combined. S.Rep. No. 552, 91st Cong., 1st Sess., reprinted in [1969] U.S.Code Cong. & Ad.News 1645, 2027, at 2098. These changes do not indicate that Congress wanted the most expansive possible definition of VEBA.

The Corporation points out that since 1969, as discussed above, the proposed regulation allowed exemptions for VEBAs composed of "the employees of one indus-

---

**4.** The government denies that this was a liberalization because the omission of the 85% requirement occurred at the same time as the extension to these organizations of the tax on unrelated business income. However, it is not disputed

that the amendment made VEBA status more widely available, although the VEBA's tax burden would increase with its unrelated business income.

try" and the Trust was found exempt thereunder. Also since 1969, Congress has amended § 501 ten times, without changing § 501(c)(9) or casting doubt on the proposed regulation. Not until 1981 did the "same geographic locale" limitation become law.

The Corporation argues that congressional silence over the 12 year existence of the proposed regulation impliedly affirms that regulation's validity. However, the government points out similar evidence of congressional acquiescence in the final regulation. In the legislative history of the Tax Reform Act of 1984, the House Report contains a discussion of the current eligibility requirements of VEBAs. The discussion essentially tracks the present language of the final regulation, including the conclusion that an employment-related bond will be found in the case of "employment by one or more employers in the same line of business in the same geographic locale." H.R.Rep. No. 432, 98th Cong., 2d Sess. 1285 (1984), U.S.Code Cong. & Admin.News 1984, pp. 697, 945. The Report provides the following example: "Under these standards ..., a group of car dealers in the same city or other similarly restricted discrete geographical locale could form a VEBA to provide permissible benefits to their employees." *Id.* Neither the Senate nor the Conference Report contains a contrary statement, and the Conference Report generally follows the House Report's provisions. H.R.Rep. No. 861, 98th Cong., 2d Sess. 1154, 1164 (1984), U.S.Code Cong. & Admin.News 1984, pp. 697, 1445. According to the government, this discussion of the final regulation, while not in the context of an amendment or reenactment of § 501(c)(9), constitutes an implied approval of the Commissioner's method of implementing § 501(c)(9).

At this point, the court should note that even if congressional inaction and statutory ambiguity support the proposed regulation, that alone would not resolve the question of whether the final regulation is invalid. The Commissioner is empowered to make choices among various permissible regulations. The *National Muffler* Court clearly pointed out that the Commissioner is held to a standard of implementing the statute in some reasonable manner. An argument that one permissible interpretation is better than another is properly directed not to the courts, but to the agency itself or to Congress. Instead, this court must determine if the final regulation is consistent with congressional intent as expressed in the statute, or if it is inconsistent or otherwise "unreasonable." The court finds that it is not, and hence the government's motion for summary judgment is granted.

The final regulation provides that membership in a VEBA must be defined by reference to an "employment-related common bond" among the members. The Corporation does not contest that a test for finding an "employment-related common bond" would be an appropriate method for determining the existence of a VEBA. The court agrees that the finding of an appropriate bond would provide a reasonable method of determining the nature of an "employees' beneficiary association." In defining the bond, the final regulation proceeds by example, noting that a common employer or affiliated employers provides such a bond. Additionally, coverage under a common collective bargaining contract or membership in one or more locals of a national or international union provide that employment-related bond. Finally, employees of one or more employers engaged in the same line of business in the same geographic locale share a sufficient bond for purposes of the VEBA exemption. Superficially, these descriptions of bonds sufficient to create an employee beneficiary association are reasonable.

The Corporation argues, however, that there is no justification for the distinction between unionized employees of multiple employers and nonunionized employees of multiple employers. However, the government adequately responds to this distinction. The regulation is directed to drawing a line between memberships with strong employment-related bonds and member-

ships most strongly related by a desire to obtain insurance rather than a preexisting employment relation. Membership in a union is a strong, preexisting employment-related bond which may be unrelated to the VEBA exemption and thus the desire to obtain lower-cost insurance benefits. However, the employment bond between employees of different employers is much weaker; there may be no bond between them except the desire for insurance. The government may legitimately draw a reasonable line in determining the strength of the employment bond necessary to establish VEBA membership.

The government draws another line, however, that appears more difficult to measure, and that is the line between various nonunionized multiple-employer VEBAs. The final regulation basically recognizes that such a VEBA with employers of the same geographic locale has a membership with a sufficiently strong employment-related bond as to qualify for the exemption. (This tends to undercut the government's argument that a multiple-employer VEBA is more like a taxable insurance company. The court rejects this argument, at any rate, because the regulations provide the basis for distinguishing between entities that are truly VEBAs and those that are more like insurance companies. *See* 26 C.F.R. § 1.501(c)(9)–2(c)(3) & 4 [Example 3].) The question before the court thus becomes whether the Commissioner may distinguish among VEBAs based on geography.

The government argues that "[a]t least where employees work for employers engaged in the same geographic locale, they are likely to have something employment related in common other than a mere desire for insurance." (United States' Memorandum, filed 6/24/84, p. 14.) It is not clear why living in a similar locality renders two employees of different employers somehow more related in their employment than they would be if employed in different localities. Fortunately for the government, this is not the sole justification for the limitation. The government argues additionally that as a VEBA such as the Corporation gets larg-

er, the interests of third parties in providing administrative services for the provision of insurance coverage increase, and private interests motivated by the desire for profits are thus promoted. The argument continues that a tax exemption should not be employed to benefit private interests motivated by the quest for profits.

The VEBA regulation applicable to multiple-employer employees, thus, seeks to establish among members an employment-related bond that is strong enough to bind members into a true "employees' association" and that does not provide tax exempt status to organizations constituted substantially of unrelated parties that provide insurance coverage. It may be argued that the regulation's geographic limitation is an imprecise way to accomplish these twin goals. For example, the bonds among participants in national and local nonunionized multiple-employer VEBAs are probably similar. It is possible that large national employers or employer associations operating under a national collective bargaining contract utilize the services of third-party insurance providers. However, the Commissioner is entitled to make these decisions as long as they reasonably implement the statutory definition of a VEBA. The Commissioner is not required to issue regulations that are the most precise, only those that implement the statute in "some reasonable manner."

Viewed in this light, the "same geographic locale" limitation is not an impermissible narrowing of the statute. The limit applies only to multiple employer VEBAs that do not have the additional employment-related bond common to co-employees or union members. Hence, the requirement does not limit the scope of all possible VEBAs in a way that the statute limits the scope of all benevolent life insurance companies, for example. Additionally, the geographic limitation does not unduly narrow the scope of § 501(c)(9). The government points out that the Commissioner could have adopted any number of permissible definitions of VEBAs. One of those definitions might have limited VE-

BAs to employees of one employer.[5] The final regulation, like the proposed regulation, accepts a broader definition of a sufficient employment-related bond, albeit with a geographic limitation on the nonunionized, nonaffiliated multiple employer association.[6] Hence, the regulation does not impermissibly narrow the statute's scope. Rather, the final regulation is consistent with the statutory language of § 501(c).

## CONCLUSION

The government's motion for summary judgment is granted in full. The Corporation's motion for summary judgment is denied. The case is dismissed.

It is so ordered.

---

**5.** At one point, the government offers a study published in 1931 by the National Industrial Conference Board, Inc. as evidence that such a limited regulation would be a permissible interpretation of congressional intent in passing the predecessor to § 501(c)(9) in 1928. According to the government, the study, entitled *The Present Status of Mutual Benefit Associations,* refers with one exception to VEBAs composed of employees of one employer. Only one VEBA was a multiple-employer association, and that was limited to employees in a specific geographic locale. Assuming that the study is a complete and accurate survey of the VEBAs extant in 1931—which the Corporation disputes—at best the study illustrates the type of VEBA with which Congress was likely familiar at the time of enactment. Without more, it does not indicate that Congress would not have approved of extending VEBAs to groups with weaker employment-related bonds. However, the court agrees that had the Commissioner adopted a strict single employer requirement for VEBAs, it would likely be a permissible exercise of regulatory authority.

**6.** The Corporation does not contest the government's procedures in changing the regulation. For example, there is no claim that whatever procedures were required to be followed in modifying a proposed regulation were not in fact followed. The Corporation does point to the delay between the proposed and final regulation, although the delay of 12 years is similar to the delay of 10 years involved in the *National Muffler* facts. As the *National Muffler* Court noted, agencies may change their administrative interpretations in the light of experience. 440 U.S. at 486, 99 S.Ct. at 1311.