**WATER QUALITY ASSOCIATION EMPLOYEES' BENEFIT CORPORATION, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 85–1714.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1986.

Decided July 8, 1986.

Peter M. Davis, Keck Mahin & Cate, Chicago, Ill., for plaintiff-appellant.

Michael J. Roach, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before CUMMINGS, Chief Judge, RIPPLE, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Chief Judge.

■ The Internal Revenue Code exempts a variety of corporations and associations from the federal income tax. See 26 U.S.C. § 501(c). But to qualify for an exemption from taxation an organization must meet the specific statutory language, *Commissioner v. Lake Forest, Inc.*, 305 F.2d 814, 817 (4th Cir.1962); *Producers' Creamery Co. v. United States*, 55 F.2d 104, 106 (5th Cir.1932), and the cases there cited,[1] and the additional "needful rules and regulations" that the Secretary of the Treasury ("Secretary") prescribes in aid of the statute's interpretation. See 26 U.S.C. § 7805(a); *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519. That an organization is of a type similar to those exempted is not enough. *Employees' Benefit Association of American Steel Foundries v. Commissioner*, 14 B.T.A. 1166, 1183 (1929).

Appellant Water Quality Association Employees' Benefit Corporation ("taxpayer") claims that it is exempt from the federal income tax because it is a voluntary employees' beneficiary association ("VEBA") as described in Section 501(c)(9) of Title 26, United States Code,[2] though it concedes that it does not satisfy the Treasury Regulations' "same geographic locale" requirement. See Treas.Reg. § 1.501(c)(9)–2(a)(1), 26 C.F.R. § 1.501(c)(9)–2(a)(1) (1981).[3] In an action brought in federal district court pursuant to 28 U.S.C. § 1346(a), appellant sought a refund of $85,178 in taxes paid for the year 1981; it asserted that the same locale provision is an impermissible restriction added to the statutory language of Section 501(c)(9). The district court held otherwise and granted summary judgment in favor of the government. *Water Quality Association Employees' Benefit Corp. v. United States*, 609 F.Supp. 91 (N.D.Ill. 1985). Because this provision of the Treasury Regulations unreasonably narrows the exemption that Congress granted in Section 501(c)(9), we reverse and remand.

I

For a number of years the taxpayer and its predecessor, the Water Quality Association Employees' Benefit Trust ("Trust"), enjoyed tax-exempt status as a VEBA. Acting under proposed Treasury Regulations published in 1969, the Internal Revenue Service granted the exemption in 1977 based upon the Trust's 1976 application.

---

**1.** See also *United States Trust Co. of New York v. Anderson*, 65 F.2d 575, 577 (2d Cir.1933) (tax exemptions will not be applied to particular case unless granted in statute in plain terms), certiorari denied, 290 U.S. 683, 54 S.Ct. 120, 78 L.Ed. 589; but see *Helvering v. Bliss*, 293 U.S. 144, 150–151, 55 S.Ct. 17, 20, 79 L.Ed. 246 (rule of liberal construction applied to charitable contributions).

**2.** The exemption applies to
Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual.
26 U.S.C. § 501(c)(9).

**3.** Treas.Reg. § 1.501(c)(9)–2(a)(1) reads in part as follows:
The membership of an organization described in section 501(c)(9) must consist of individuals who become entitled to participate by reason of their being employees and whose eligibility for membership is defined by reference to objective standards that constitute an employment-related common bond among such individuals. Typically, those eligible for membership in an organization described in section 501(c)(9) are defined by reference to a common employer (or affiliated employers), to coverage under one or more collective bargaining agreements (with respect to benefits provided by reason of such agreement(s)), to membership in a labor union, or to membership in one or more locals of a national or international labor union....
In addition, employees of one or more employers engaged in the same line of business in the same geographic locale will be considered to share an employment-related bond for purposes of an organization through which their employers provide benefits.
26 C.F.R. § 1.501(c)(9)–2(a)(1) (1981).

At that time, Treasury Regulations required that

> [a]n organization described in section 501(c)(9) must be composed of individuals who are entitled to participate in the association by reason of their status as employees who are members of a common working unit. The members of a common working unit include, for example, the employees of a single employer, the employees of one industry, or the members of one labor union.

Proposed Treas.Reg. § 1.501(c)(9)–1(b)(1), 34 Fed.Reg. 1028 (1969). The Trust then as now[4] was used to fund an insurance program for the employees (and their dependents) of members of the Water Quality Association ("WQA")—a group of small businessmen who manufacture, distribute, supply and sell point-of-use water treatment equipment (*e.g.*, water softeners). The exemption enhanced the financial stability of the Trust since the Trust was thus able to earn income on the accumulated dividends that it held as reserves without adverse tax consequences.

On July 17, 1980, the 1969 proposed Treasury Regulations were withdrawn and proposed amendments to the regulations under Section 501(c)(9) were substituted in their place. Among the changes was a new provision that restricted membership in tax-exempt VEBAs to employees engaged in the same line of business in the same geographic area if they are not employed by a common employer; the geographic restriction did not apply to VEBAs whose membership consisted of employees who belong to a labor union or work for affiliated employers. This provision was retained in the Final Regulations published on January 8, 1981. See Treas.Reg. § 1.501(c)(9)–2(a)(1); 46 Fed.Reg. 1719, 1721 (1981). As a result, the Internal Revenue Service no longer recognized the exempt status of the Trust since participation admittedly was not geographically restricted; WQA members operate their businesses nationwide and therefore their employees are not located in the same geographic locale.

## II

The only issue to be decided on this appeal is whether the "same geographic locale" restriction of Treas.Reg. § 1.501(c)(9)–2(a)(1) is a permissible interpretation of the Tax Code. A Treasury Regulation such as the one before us was promulgated pursuant to the Secretary's general authority to "prescribe all needful rules and regulations for the enforcement of [the revenue laws]," 26 U.S.C. § 7805(a); it is an "interpretative" rather than "legislative" regulation. *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814. The latter is issued under a specific delegation of authority by Congress and has the same effect as a valid statute. *Batterton v. Francis*, 432 U.S. 416, 425 & n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448. Legislative regulations therefore are accorded greater deference than interpretative regulations, and judicial inquiry concerning legislative regulations is limited to "whether the interpretation or method is within the delegation of authority." *Rowan Companies, Inc. v. United States*, 452 U.S. at 253, 101 S.Ct. at 2292. On the other hand, a court may when appropriate substitute its judgment for an agency's when the regulation is interpretative. *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343; *Batterton v. Francis, supra; CWT Farms, Inc. v. Commissioner*, 755 F.2d 790, 800 (11th Cir.1985) (citations omitted). See also Davis, Administrative Law Treatise § 7.8 at 36–43 (2d ed. 1979).

Still, courts ordinarily owe deference to a regulation that " 'implement[s] the congressional mandate in some reasonable manner.' " *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792, quoting *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537. But despite the rather broad deference often given to Treasury

---

**4.** The Trust transferred the insurance plan and its assets to the taxpayer on August 1, 1981. The taxpayer operates the insurance program in the same manner as the Trust had done.

Regulations, see *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes" and "should not be overturned except for weighty reasons"), a court nonetheless must scrutinize a regulation's fidelity to the overall statutory framework and legislative history, see *United States v. Vogel Fertilizer Co.,* 455 U.S. at 24–26, 102 S.Ct. at 827–28; an interpretative regulation is not a statute, and the Treasury is not the Congress. See *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress...."). Our analysis here requires that we "look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose," *National Muffler Dealers Association, Inc. v. United States,* 440 U.S. at 477, 99 S.Ct. at 1307, and consider the following:

> A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent reenactments of the statute.

*Id.*

### III

The history of Section 501(c)(9) is sketchy at best. This provision was first enacted as Section 103(16) of the Revenue Act of 1928, ch. 852, 45 Stat. 791. The Ways and Means Committee Report simply states that the exemption was granted because "[v]oluntary employees' beneficiary associations providing for the payment of life, sick, accident or other benefits to members and their dependents are common to-day and it appears desirable to provide specifically for their exemption from the ordinary corporation tax...." H.R.Rep. No. 2, 70th Cong., 1st Sess. at 17, 1939–1 C.B. (Part 2) 384, 395. See also S.Rep. No. 960, 70th Cong., 1st Sess. at 25, 1939–1 C.B. (Part 2) 409, 426 (same as Ways and Means Committee Report except for clerical changes). The legislative history accompanying each re-enactment of the exemption is equally unhelpful as concerns the issue before us and provides no insight as to its *raison d'être.* That the exemption elicited no more than cursory legislative explanation is not surprising; the accounts of the initial enactment and re-enactment of most of today's exemptions are equally silent. See Bittker & Rahdert, *The Exemption of Nonprofit Organizations from Federal Income Taxation,* 85 Yale L.J. 299, 301 (1976). A similar lack of commentary on the subject has led two commentators to speculate that this scholarly silence "may have reflected a conviction that the wisdom of tax exemption was self-evident, that the basic policy was politically invulnerable to change, or that taxation in this area would bring in little revenue." *Id.*

But the absence of historical notes on the exemption's meaning and scope does not end the matter. The Section 501(c)(9) exemption does not exist in a vacuum; rather it co-exists with a number of other quite diverse organizations that Congress saw fit to exempt from the federal income tax. See 26 U.S.C. § 501(c). " 'The true meaning of a single section of a statute in a setting as complex as that of the revenue acts, however precise its language, cannot be ascertained if it be considered apart from related sections, or if the mind be isolated from the history of the income tax legislation of which it is an integral part.' " *Commissioner v. Engle,* 464 U.S. 206, 223, 104 S.Ct. 597, 607, 78 L.Ed.2d 420 quoting *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 126, 55 S.Ct. 60, 62, 79 L.Ed. 232. We therefore examine the language that Con-

gress employed in describing the other organizations listed under Section 501(c). Compare *Rowan Companies, Inc. v. United States,* 452 U.S. at 254–55, 101 S.Ct. at 2293 (Congressional intent of concept of "wages" under FICA and FUTA determined by reference to the Acts establishing income tax withholding).

Of particular note is an exemption that Congress created on the heels of that for VEBAs. Section 103(17) of the Revenue Act of 1928, ch. 852, 45 Stat. 791, "introduce[d] into the law a new kind of exempt organization, namely, teachers' retirement fund associations *of a purely local character.*" H.R.Conf.Rep. No. 1882, 70th Cong., 1st Sess. at 13–14, 1939–1 C.B. (Part 2) 444, 447 (emphasis added). See 26 U.S.C. § 501(c)(11).[5] As with the enactment of the exemption for VEBAs, counsel have not been able to provide[6] and we have not been able to locate any reference to the purpose of the exemption. Still, it is significant that Congress chose to define by geographic limitation those teacher retirement funds which are eligible for exempt status while at the same time choosing not so to limit VEBAs.

Congress explicitly placed similar geographic restrictions on two other organizations listed in Section 501(c). See 26 U.S.C. §§ 501(c)(4) ("local" associations of employees whose membership is limited to employees of a designated person or persons in a "particular municipality")[7] and 501(c)(12)(A) (benevolent life insurance associations of a "purely local character").[8] The government would have us uphold the validity of the Treasury Regulation's geographic limitation on certain VEBAs without reference to these other exemptions. We cannot do this unless, of course, we ignore the structure and composition of Section 501(c) and read its various subparts as distinct and separate from one another. Instead the whole of Section 501(c)'s various subparts should be harmonized if possible. See 2A Sutherland Statutory Construction § 46.05 (4th ed. 1984) (not proper to confine interpretation to the one section to be construed and in isolation from related sections of statute).

The use of the words "purely local character," "particular municipality," and "local" give a very clear description and distinctly confined meaning to the organizations to which they refer. Such words are to be contradistinguished from the absence of like qualifications as to an organization's scope or situs. It is unlikely that Congress inadvertently but rather purposely omitted the geographically restrictive language that Treas.Reg. § 1.501(c)(9)–2(a)(1) now employs. See 2A Sutherland Statutory Construction § 51.02 (4th ed. 1984) (" 'where a statute, with reference to one

---

**5.** Section 501(c)(11) provides for the exemption of

Teachers' retirement fund associations of a purely local character, if—
(A) no part of their net earnings inures (other than through payment of retirement benefits) to the benefit of any private shareholder or individual, and
(B) the income consists solely of amounts received from public taxation, amounts received from assessments on the teaching salaries of members, and income in respect of investments.
26 U.S.C. § 501(c)(11). There are no regulations issued under this section.

**6.** We requested counsel at oral argument to provide us with any legislative history explaining the reasons for the geographic limitations contained in 26 U.S.C. §§ 501(c)(4), (11) and (12)(A).

**7.** Section 501(c)(4) provides an exemption for

Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.
26 U.S.C. § 501(c)(4).

**8.** The Tax Code provides an exemption for

Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses.
26 U.S.C. § 501(c)(12)(A).

subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed' "). An examination of the tumultuous early history of Section 501(c)(12)(A) further supports our view and illustrates Congress' keen awareness of statutory language that permits an organization exempt status only if its membership is confined to a given locality.

In its original form, Section 501(c)(12)(A) exempted any "Farmers' or other mutual hail, cyclone or fire insurance company, mutual ditch or irrigation company, mutual or cooperative telephone company, or like organization of a purely local character." Section 11(a) (Tenth) of the Revenue Act of 1916, ch. 463, 39 Stat. 756. In 1919, the Bureau of Internal Revenue ruled that the "purely local" limitation applied only to those organizations which qualified as "like organization[s]" and not to the named types of organizations. 0.792, 1 C.B. 204 (1919). A few years later, the court in *Commercial Health & Accident Co. v. Pickering*, 281 F. 539 (S.D.Ill.1922), reached an opposite result. It concluded that the exemption's words of limitation applied to all businesses, without regard to whether they came within one of the listed categories, or whether they qualified only as a "like organization," and held that the taxpayer, a statewide health and accident insurer, was not a company of a purely local character and therefore not exempt from taxation. *Id.* at 542–543. See also *Hardware Underwriters and National Hardware Service Corp. v. United States*, 65 Ct.Cl. 267, 284 (1928) ("The statute intended to confine the exemption to associations or companies of a purely local character.").

After the *Pickering* decision, the Bureau of Internal Revenue reversed its position and held that a storm and tornado insurance company with offices in 14 counties of one state was not "purely local" in character and therefore did not qualify for the exemption. S.T. 405, II–1 C.B. 250 (1923). Accord, I.T. 1556, II–1 C.B. 157–158 (1923) (mutual fire insurance company doing business in 30 counties held not exempt). Then in 1924, Congress revised the exemption to include benevolent life insurance associations "of a purely local character" but removed the "local" restriction on the other types of organizations listed.[9] Revenue Act of 1924, ch. 234, 43 Stat. 253, Sec. 231(10); H.R.Rep. No. 179, 68th Cong., 1st Sess. at 24, 1939–1 C.B. (Part 2) 241, 258; S.Rep. No. 398, 68th Cong., 1st Sess. at 29, 1939–1 C.B. (Part 2) 266, 286; H.R.Conf. Rep. No. 844, 68th Cong., 1st Sess. at 21, 1939–1 C.B. (Part 2) 300, 305. In the Senate floor discussion on the bill, Senator Watson stated that the purpose of the bill was to reverse the Treasury rulings adopting the restrictive statutory construction of the *Pickering* case, and to allow mutual companies to qualify for the exemption even if they were not local in character. 65 Cong.Rec. 8106 (1924). Compare *The Family Aid Association of the United House of Prayer for All People v. United States*, 93 Ct.Cl. 201, 205, 36 F.Supp. 1017 (1941) (association whose membership confined to individuals of a certain church with local churches in seven states and whose sole purpose was to provide a decent burial for its members not exempt as a benevolent life insurance association under Section 103(10) (formerly Section 231(10)) because it was not "an association 'of a purely local character' "). Thus, when viewed alongside the other classes of organizations that Congress chose to exempt from the federal

**9.** Before Congress provided specifically for its exemption in 1928, a VEBA was afforded tax-exempt status only if it could be found to fall within an existing exemption. The exemption for organizations likened to a benevolent life insurance association proved to be the means. In a revenue ruling issued before the creation of the exemption for VEBAs, an association composed of employees of a company and affiliated corporations which was organized to provide health, disability, retirement and death benefits for its members was found to fall within the strictures of Section 231(10) of the Revenue Act of 1924 and therefore exempt as a "[b]enevolent life insurance association[ ] of a purely local character, ... or like organization[ ]." I.T. 2425, VII–2 C.B. 153 (1928), declared obsolete by Rev.Rul. 67–46, 1967–1 C.B. 377, 378.

income tax, the absence of geographically limiting words within Section 501(c)(9) reveals a Congressional intent that exempt-status be granted VEBAs generally.

█ It is a basic principle of statutory construction that courts have no right first to determine the legislative intent of a statute and then, under the guise of its interpretation, proceed to either add words to or eliminate other words from the statute's language. *DeSoto Securities Co. v. Commissioner*, 235 F.2d 409, 411 (7th Cir.1956); see also 2A Sutherland Statutory Construction § 47.38 (4th ed. 1984). Similarly, the Secretary has no power to change the language of the revenue statutes because he thinks Congress may have overlooked something. *United States v. Calamaro*, 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 ("[W]e cannot but regard this Treasury Regulation as no more than an attempted addition to the statute of something which is not there."); *Bates v. United States*, 581 F.2d 575, 579 (6th Cir.1978) ("[R]egulations may not be used to supply supposed omissions in a revenue act or to enlarge the scope of such a statute.... Nor may a regulation be used to alter or amend a statute by prescribing requirements which are inconsistent with its language."). The requirement that certain VEBAs be confined to a geographic locality in order to qualify for tax-exempt status necessarily narrows the scope of Section 501(c)(9) and effectively attempts to legislate rather than interpret the revenue laws.

## IV

Even so, the meaning of "voluntary employees' beneficiary association" admittedly is not defined within the confines of the statute and is thus well suited to the Secretary's interpretive guidance. Compare *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. at 476, 99 S.Ct. at 1306 ("term 'business league' has no well-defined meaning or common usage outside the perimeters of § 501(c)(6)" and "is a term 'so general ... as to render an interpretive regulation appropriate'"). The taxpayer concedes as much and agrees

that "some employment-related bond is necessary to distinguish true VEBAs from entrepreneurial commercial insurance ventures" (Br. at 15 n. 4). Moreover, the government correctly points out that the choice among reasonable interpretations is for the Secretary, not the courts, and that his choice, if found to implement the congressional mandate in some reasonable manner, must be upheld. *Commissioner v. Engle*, 464 U.S. at 224, 104 S.Ct. at 608. The government, however, has not persuaded us that the Secretary's interpretation is reasonable and therefore entitled to deference. See *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 16, 52 S.Ct. 275, 280, 76 L.Ed. 587 (administrative interpretation of a statute has no more force than the reasons given to sustain it).

First, neither the 1969 proposed nor the 1981 final regulations carry particular force since neither are a "substantially contemporaneous construction" of Section 501(c)(9). See *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. at 477, 99 S.Ct. at 1307. Forty years passed before the Secretary first proposed regulations under Section 501(c)(9); until that time the Secretary administered Section 501(c)(9) and acted upon applications for tax-exempt status without the aid of interpretive regulations. The manner in which the regulation, and particularly the "same geographic locale" limitation, evolved therefore warrants inquiry. *Id.*

Beginning in 1969 and into 1980, the Secretary acted under interpretative regulations which provided a Section 501(c)(9) exemption to an organization whose membership consisted of "employees of one industry;" there was no requirement that the employees also be located in the same geographic area. 34 Fed.Reg. 1028. As the district court correctly noted, "the exemption for the Trust was well within the [1969] proposed Treasury Regulation defining the scope of VEBAs." 609 F.Supp. at 93 (footnote omitted). The fact that all employees who participated in the Trust's insurance plan worked in the same industry and only for employers who belonged to

the same trade association,[10] met the proposed regulation's requirement of membership in "a common working unit." 34 Fed. Reg. 1028; compare 26 C.F.R. § 1.501(c)(9)–2(a)(1) (1981) (VEBA membership defined by reference to "objective standards" that constitute "an employment-related common bond" among employee members).

Then in 1980, the geographic restriction made its first appearance in the amendments to the 1969 proposed Treasury Regulations. See 45 Fed.Reg. 47871, 47872 (1980).[11] The Secretary received a number of comments that called for the deletion of the geographic restriction; but the final regulations published on January 7, 1981, retained the provision. 46 Fed.Reg. 1719, 1721 (1981).[12] In the supplementary information accompanying the final regulations, the Secretary explained his reasons as follows:

> First, section 501(c)(9) provides for the exemption of associations of employees who enjoy some employment related bond. Allowing section 501(c)(9) to be used as a tax-exempt vehicle for offering insurance products to unrelated individuals scattered throughout the country would undermine those provisions of the Internal Revenue Code that prescribe the income tax treatment of insurance companies. Second, it is the position of the Internal Revenue Service that where an organization such as a national trade association or business league exempt from taxation under section 501(c)(6) operates

a group insurance program for its members, the organization is engaged in an unrelated trade or business. See Rev. Rul. 66–151, 1966–1 C.B. 152; Rev.Rul. 73–386, 1973–2 C.B. 191; Rev.Rul. 78–52, 1978–1 C.B. 166. To allow trade associations to provide insurance benefits through a trust exempt under section 501(c)(9) would simply facilitate circumvention of the unrelated trade or business income tax otherwise applicable to such organizations.

46 Fed.Reg. at 1720, 1981–1 C.B. 338, 339. The government advances these same reasons on appeal in support of the reasonableness of Treas.Reg. § 1.501(c)(9)–2(a)(1). It further claims that the same geographic locale restriction is necessary "to distinguish between associations whose membership is based on an employment-related common bond and those which more closely resemble taxable insurance companies."

That the quintessential element of a Section 501(c)(9) tax-exempt VEBA is the commonality of interests among its employee members is not disputed. An association of unrelated individuals scattered throughout the country plainly would not fall within the scope of Section 501(c)(9) though its membership is comprised entirely of employees because there is no "employment-related common bond" among such individuals. See Treas.Reg. § 1.501(c)(9)–2(a)(1). But by the same token the relatedness among a group of employees is neither established nor dissipated depending upon

---

**10.** WQA is a tax-exempt trade organization. See 26 U.S.C. § 501(c)(6).

**11.** The revised proposed regulation provided, in part, as follows:

> The membership of an organization described in section 501(c)(9) must consist of individuals who become entitled to participate by reason of their being employees and whose eligibility for membership is defined by reference to objective standards that constitute an employment-related common bond among such individuals. Typically, those eligible for membership in an organization described in section 501(c)(9) are defined by reference to a common employer (or affiliated employers), to coverage under one or more collective bargaining agreements (with

respect to benefits provided by reason of such agreement(s)), to membership in a labor union, or to membership in one or more locals of a national or international labor union.... In addition, employees of one or more employers engaged in the same line of business *in the same geographic area* will be considered to share an employment-related bond for purposes of an organization through which their employers provide benefits.... 45 Fed.Reg. 47871, 47872 (1980) (emphasis added).

**12.** The language of the proposed revised regulation quoted in note 11, *supra,* remained the same with the substitution of the word "locale" for the word "area." See note 3, *supra.*

the geographic locale of the group's members.

Unlike the commonality associated with labor union membership, a common employer or employment in the same line of business, geography alone has no reasonable or logical relation to the establishment of an "employment-related" bond; rather, the Secretary's "same geographic locale" requirement for certain VEBAs may be likened to an organization whose membership is based on the national origin or religious affiliation of its members; in both cases, the employment status of the individual members is irrelevant. We therefore join in the district court's skepticism of and reject the government's assertion that employees who work for employers located in the same geographic area are likely to have "something employment related in common"; "[i]t is not clear why living in a similar locality renders two employees of different employers somehow more related in their employment than they would be if employed in different localities." 609 F.Supp. at 97. In this respect the Secretary's own regulation is inherently inconsistent.

Further, the regulations provide an adequate basis for distinguishing between a true VEBA and a commercial insurance company or entrepreneurial venture. Treas.Reg. § 1.501(c)(9)–2(c) provides by description and example what is meant by a voluntary association of employees. 26 C.F.R. § 1.501(c)(9)–2(c) (1985). In contrast to a taxable insurance company (or other business venture), a tax-exempt VEBA must be controlled by its employee members, independent trustees (such as a bank), or trustees or other fiduciaries, at least some of whom are designated by or on behalf of the employee members. 26 C.F.R. § 1.501(c)(9)–2(c)(3) (1985). The regulation further provides an example to illustrate how the Secretary is able to make the distinctions:

> *Example (3).* A, an individual, is the incorporator and chief operating officer of Lawyers' Beneficiary Association (LBA). LBA is engaged in the business of providing medical benefits to members of the Association and their families. Membership is open only to practicing lawyers located in a particular metropolitan area who are neither self-employed nor partners in a law firm. Membership in LBA is solicited by insurance agents under the control of X Corporation (owned by A) which, by contract with LBA, is the exclusive sales agent. Medical benefits are paid from a trust account containing periodic "contributions" paid by the members, together with proceeds from the investment of those contributions. Contribution and benefit levels are set by LBA. The "members" of LBA do not hold meetings, have no right to elect officers or directors of the Association, and no right to replace trustees. Collectively, the subscribers for medical benefits from LBA cannot be said to control the association and membership is neither more than nor different from the purchase of an insurance policy from a stock insurance company. LBA is not a voluntary employees' beneficiary association.

26 C.F.R. § 1.501(c)(9)–2(c)(4) (1985). Indeed, the geographic scope or location of multiple employer VEBAs impacts little (if at all) on the Secretary's regulatory line-drawing between organizations that are truly VEBAs and those that are more like insurance companies, and the district court therefore correctly rejected this rationale. 609 F.Supp. at 97.

Similarly unavailing is the government's argument that the "same geographic locale" limitation is necessary to prevent circumvention of the unrelated business income tax (see 26 U.S.C. § 511) otherwise applicable to tax-exempt trade associations (like WQA) which administer insurance programs (unlike WQA's sponsored plan). The argument ignores the distinctions drawn between Section 501(c)(6) and Section 501(c)(9) organizations. Both are separate entities and each must satisfy differing requirements to qualify for tax-exempt status. Compare Treas.Reg. § 1.501(c)(6)–

1, 26 C.F.R. § 1.501(c)(6)–1 (1985)[13] with Treas.Reg. §§ 1.501(c)(9)–1 to –7, 26 C.F.R. §§ 1.501(c)(9)–1 to –7 (1985). A trade association does not avoid the unrelated business income tax when it sponsors a tax-exempt VEBA; any income that the insurance program generates is that of the VEBA, not the trade association; the trade association has no control over or right to insurance program income.

■ To the extent that a Section 501(c)(6) trade association operates or administers an insurance program not substantially related to its tax-exempt purposes, it remains subject to the unrelated business income tax, see *Professional Insurance Agents of Michigan v. Commissioner,* 726 F.2d 1097, 1104 (6th Cir.1984); *Carolinas Farm & Power Equipment Dealers Association, Inc. v. United States,* 699 F.2d 167, 171–72 (4th Cir.1983). In Rev.Rul. 66–151, 1966–1 C.B. 152, for example, the Commissioner of Internal Revenue was asked to issue a ruling on whether a business league's management of health and welfare plans for its members, for which it received a fixed fee for each employee covered by the various plans, was exempt under Section 501(c)(6). The Commissioner had no trouble in determining that this activity constituted "a business not substantially related to the functions forming the basis for the exemption of the organization."[14] See also *Steamship Trade Association of Baltimore, Inc. v. Commissioner,* 81 T.C. 303, 315–17 (1983), affirmed 757 F.2d 1494 (4th Cir.1985) (administrative services performed by a trade association for the benefit of its members held to give rise to unrelated business income).

Because each WQA member employs on the average five individuals, they wisely decided about 30 years ago to pool their insurance premiums to provide increased insurance protection for their employees at a decreased cost. The Trust therefore was established and an insurance company appointed to underwrite the joint purchase of group life, health and disability insurance for member employees and their dependents; the Trust itself at no time underwrote the insurance coverage for participants. This same desire to band together to obtain more economically insurance benefits for groups of workers lies at the heart of the social purpose that Section 501(c)(9) serves. See generally Hedges, *Labor's Interest in Group Insurance,* 2 Law & Contemp.Probs. 94 (1935) (tracing major stages of the evolution of group insurance in the labor field). Although the government does not contend that the taxpayer is in reality a commercial insurance venture or that it otherwise contravenes the benevolent purposes of Section 501(c)(9), its tax-exempt purpose undeniably is to provide insurance coverage; thus, there is little doubt but that the taxpayer (or any VEBA for that matter) vies for the same dollars as its taxable counterparts in the insurance industry. But we fail to see how a tax-exempt trade association's sponsorship of a tax-exempt VEBA would facilitate circumvention of the unrelated business income tax or otherwise impermissibly foster unfair competition with commercial insurance companies whose profits are fully taxable. See *United States v. American College of Physicians,* —— U.S. ——, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (Section 511(a)'s imposition of a tax on the unrelated business income of tax-exempt organizations "struck a balance between its two objectives of

13. The regulation defines a Section 501(c)(6) entity as an association of persons having a common business interest; for the purpose of promoting that common interest, but not to engage in a regular business of the kind ordinarily carried on for profit. The regulation continues:

Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from

the performance of particular services for individual persons.
Treas.Reg. § 1.501(c)(6)–1, 26 C.F.R. § 1.501(c)(6)–1 (1985).

14. The organization was composed of firms in a particular industry, and its purpose and principal activity was to represent the member firms in all matters pertaining to their relations with labor and labor unions.

encouraging benevolent enterprise and restraining unfair competition").

Our holding today in no way detracts from the authority of the Secretary to prescribe all needful regulations for the enforcement of the tax laws (see 26 U.S.C. § 7805(a)) and the propriety to choose the method that best implements the statutory mandate. See *United States v. Correll*, 389 U.S. at 306–07, 88 S.Ct. at 449. True, the "same geographic locale" restriction does not limit the scope of all possible VEBAs in a way that Section 501(c)(12)(A), for example, limits the scope of all benevolent life insurance companies; the district court correctly points out that the limitation "applies only to multiple employer VEBAs that do not have the additional employment-related bond common to co-employees or union members." 609 F.Supp. at 97. Nonetheless, the geographic limitation of Treas.Reg. § 1.501(c)(9)–2(a)(1) is unduly restrictive of Section 501(c)(9)'s scope. Just as the Secretary cannot resolve abuses by eliminating the exemption altogether, see *Commissioner v. Engle*, 464 U.S. at 227, 104 S.Ct. at 609, he likewise cannot narrow the exemption so as to exclude out of hand some though not all otherwise exempt organizations. We therefore conclude that the Secretary's distinction among VEBAs based on geography is unreasonable and that it impermissibly excludes VEBAs that the statute otherwise exempts. Accordingly, Treas.Reg. § 1.501(c)(9)–2(a)(1) is invalid to the extent that it requires associations whose membership consists of employees of one or more employers engaged in the same line of business to meet the added "same geographic locale" restriction in order to receive tax-exempt status.

For the taxpayer to prevail, it would still have to establish that individual employers participating in the plan do not discriminate in favor of their key employees before it would be entitled to judgment. See 26 U.S.C. § 505. Both parties agree that the issue of discrimination is factual and that its resolution should await the outcome of the legal issue of the validity of the "same geographic locale" restriction of Treas. Reg. § 1.501(c)(9)–2(a)(1).

The grant of summary judgment in favor of the government is reversed and the cause is remanded for further proceedings.