COMMONWEALTH vs. ROBERT O'BRIEN.

Middlesex. October 6, 1994. - February 10, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Evidence*, Recross-examination, Cross-examination, Present recollection refreshed. *Constitutional Law*, Confrontation of witnesses.

Where, at a criminal trial, the judge properly excluded defense counsel's questions to a witness on recross-examination raising a matter beyond the scope of redirect examination, there was no violation of the defendant's constitutional right to confront the witness. [475-477] O'CONNOR, J., dissenting, with whom WILKINS & GREANEY, JJ., joined.

This court declined to address an issue that had not adequately been preserved for appellate review. [477-478]

Discussion of State and Federal cases considering the evidentiary conflict that may arise when the party in possession of a writing used to refresh a witness's recollection claims that disclosure of the contents of the document is not required because the writing contains material protected by the work product doctrine. [478-480]

The court stated that, when materials protected by the work product doctrine are used by a party at trial to refresh a witness's recollection on the stand, the protection afforded by the work product doctrine is waived and the opponent's attorney is entitled to inspect the writing, in furtherance of the basic judicial objectives of fairness and the determination of truth. [478, 480]

INDICTMENT found and returned in the Superior Court Department on October 21, 1987.

The case was tried before *James D. McDaniel, Jr.*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Robert L. Sheketoff* for the defendant.

*Michael Adam Chinman*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant was indicted on a charge of murder in the first degree. After a jury trial, the defendant

was convicted, on March 29, 1989, of the lesser crime of involuntary manslaughter and was sentenced to from nineteen to twenty years at the Massachusetts Correctional Institution at Cedar Junction. The defendant filed a timely notice of appeal. The Appeals Court, in an unreported decision pursuant to its Rule 1:28, affirmed the conviction. 36 Mass. App. Ct. 1104 (1994). We granted the defendant's application for further appellate review. The defendant argues that the trial judge erred in (1) refusing his request to recross-examine the victim's mother, Carol Shanahan and (2) prohibiting his inspection of a document used by the prosecution to refresh the recollection of Carol Shanahan on the witness stand. We find no reversible error. We affirm the conviction.

The jury were presented with sufficient evidence to find the following facts. Late in the evening of October 3, 1987, Sean Patrick Shanahan, a five month old infant, was found dead in his crib at his mother's Somerville apartment. There were no external injuries to Sean's body except a small (one-eighth inch) abrasion on the right side of his nose. An autopsy revealed that Sean died as a result of blunt head trauma.

When initially questioned by police, the defendant, the live-in boy friend of Sean's mother, denied involvement in the child's death. However, when he was informed of the results of the autopsy, the defendant gave two separate statements admitting involvement in Sean's death. In both statements he claimed that he had accidently dropped the child during the day on October 2, but the statements differed as to how the accident occurred.[1]

_____

[1] In the first statement the defendant claimed that he fell while carrying Sean and that, when he fell, Sean's back and head hit the floor and the weight of the defendant's body fell on top of the child. After consulting the pathologist, the police informed the defendant that the injury could not have happened in the way the defendant claimed. The defendant then admitted he had lied when giving the first statement and proceeded to give a second statement. In the second statement, the defendant claimed that the injury occurred while he was playing with Sean on the living room floor. He said he flipped the child while holding his hands and that Sean acci-

Carol Shanahan had had three children prior to Sean's death. The two older children, Justin, four years old in October, 1987, and Julia, two years old in October, 1987, were fathered by the defendant, with whom Carol had had an intermittent relationship since she was fourteen years old. Prior to Sean's birth in April of 1987, Carol and the defendant had not lived together for some time.[2]

In August of 1987, when Sean was about four months old, the defendant and Carol Shanahan resumed their relationship and the defendant began living with Shanahan and her three children in her apartment in Somerville. Evidence admitted at trial tended to show that the defendant had been abusive toward Sean on a few occasions between the time that he moved into the apartment and the child's death. Carol Shanahan and her neighbor, Selena Gonzalez, both testified about an incident in which the defendant put Sean in a closet and shut the door because he was crying. Carol Shanahan also testified that one day she noticed that the child had a black eye but it was not clear whether the defendant had caused the injury. There was evidence that the defendant yelled at Sean when he cried and would sometimes shake the baby while holding him by his sides.

On October 2, 1987, Shanahan left for work at about 8 A.M., leaving the three children at home with the defendant. Just before 3 P.M. she left work and went home. Taking Justin with her, she went to her mother's house in Charlestown. She stayed at her mother's for about twenty minutes and returned to her apartment with Justin and her eight year old sister, Darlene. They arrived at approximately 4 P.M. While Shanahan was preparing dinner, Sean woke up and she fed him. She testified he appeared normal although he

---

dentally slipped and landed on the floor. This second statement was the defendant's theory of the case at trial.

[2]Carol had been involved with another man during the time that she and the defendant were apart. Carol claimed that this man was Sean's father. There was some dispute as to whether this was true, or whether the defendant was Sean's father. The resolution of this issue, and its relevance, were left to the jury.

had a runny nose. After feeding Sean, she put him back to bed. After dinner Shanahan left the apartment to buy some marihuana at the housing project across the street. When she left, Justin and Julia were in their bedroom playing, and Sean was sleeping in his crib. The defendant and Darlene were otherwise alone. Shanahan testified that she was gone about fifteen minutes.

Darlene, almost ten years old at the time of trial, testified that after Shanahan left Sean began to cry. The defendant went into Sean's room and came out carrying the baby. The defendant carried Sean into the kitchen and Sean vomited on the defendant's shoulder. Darlene testified that the defendant got a "mean" look on his face and threw Sean up in the air over his head. The defendant bent down to try to catch Sean but he was unsuccessful and Sean hit the floor, making a "loud noise" when he landed. Sean began to cry and the defendant picked him up. Darlene testified that as the defendant was carrying Sean back to his room he turned to Darlene and told her to "swear to God on Sean's soul that you won't tell anyone" or he would "get someone after [her]." The defendant put Sean back in his crib, and then sat down and watched television with Darlene until Shanahan returned. At no time did the defendant seek medical assistance for Sean.

Shanahan testified that after she returned from purchasing the marihuana the defendant's behavior changed. He said that he accepted Sean as his own child and wanted to marry her. Shanahan also testified that Darlene seemed particularly quiet. Later that evening Sean woke up and Shanahan noticed that he looked as though he had a cold; his face was puffy, his eyes were runny, and he was wheezing. She attempted to feed him but he would not eat. The next morning, October 3, Sean again appeared as if he had a cold so Shanahan left him in his crib. Shanahan's mother came over in the afternoon and looked at Sean. She testified at trial that she thought Sean looked sick. Sean remained in his crib for the rest of the day and Shanahan did not check on him again. Her neighbor, Selena Gonzalez, watched the children for a time in the afternoon.

Late that evening the defendant, Shanahan, and Selena Gonzalez decided to look in on Sean. The defendant quickly rose from his seat and entered the child's room. He came out seconds later with a look of shock on his face. He pointed to Sean's room and then ran out of the apartment. Gonzalez and Carol then went into the room and discovered that the child was dead.

1. *Denial of recross-examination.* The defendant asserts that it was his strategy at trial to impeach the testimony of Darlene and thereby establish that the head injury occurred as the result of an accident earlier on October 2 as claimed by the defendant. In order to argue successfully this theory, the defendant claims he had to show that there were symptoms of the head injury prior to the time that Darlene claims Shanahan left the apartment to buy marihuana. The defendant claims that the "cold" symptoms observed by Shanahan and other witnesses were actually symptoms of a head injury. Therefore, the defendant argues, the issue of when Sean's "cold" symptoms appeared was crucial to the defense.[3]

Under cross-examination, Carol Shanahan testified, consistent with her testimony on direct examination, that she did not see Sean on October 2, 1987, from the time she left for work in the morning until around dinner time. When she saw him, Sean appeared to have a runny nose but exhibited no other cold symptoms. Defense counsel asked Shanahan whether she remembered making a statement to the police shortly after Sean's death in which she stated that when she got home with Darlene in the afternoon the two of them looked in on Sean and that he appeared to have a cold, and that he was wheezing and gasping and sounded hoarse. Shanahan testified that, while she remembered making a

---

[3]This point is contested by the Commonwealth. The Commonwealth cites the testimony of Dr. William Zane, a pathologist, who stated on cross-examination that the possible symptoms of a recent head injury such as that suffered by Sean might be any or a combination of the following: crying, loss of consciousness, irritability, vomiting, inability to eat, and drowsiness and not the wheezing, gasping, and hoarseness the mother said she had observed.

statement to the police, she could not remember stating that she checked on Sean in the afternoon or that he had appeared to have had a cold at that time. On being shown her written statement to police made following Sean's death, Shanahan repeated that she could not recall stating she had checked on Sean in the afternoon.

On redirect examination, the prosecutor elicited testimony from Shanahan explaining that she was in an upset state on October 7 when she gave the statement because Sean's funeral had been the day before. On recross-examination, defense counsel attempted to ask Shanahan about a second statement she made some time after the October 7 statement, in preparation for trial. On the prosecutor's objection and the court's suggestion that the second statement was beyond the scope of redirect examination, defense counsel argued that the statement was within the scope of redirect because it impeached Shanahan's explanation as to why her October 7 statement was inconsistent with her trial testimony. The judge sustained the prosecution's objection. The judge precluded defense counsel from asking Shanahan about the contents of the second statement, which was not in evidence, ruling that it did not address a new matter raised on redirect.

The defendant argues that his right to confrontation under the Federal and Massachusetts Constitutions was violated when the judge denied his request to recross-examine Carol Shanahan regarding the second statement. We conclude that the judge acted within his sound discretion in ruling that the matter on which the defendant sought to examine Shanahan was not a new matter raised for the first time on redirect examination of the witness. Therefore, the defendant had no right to recross-examine her on the statement as it was beyond the scope of redirect examination.

The confrontation clause of the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution guarantee a defendant the right to cross-examine each witness against him. This right to cross-examination is an essential component to

the right to a fair trial. *Pointer* v. *Texas,* 380 U.S. 400, 405 (1965). *United States* v. *Caudle,* 606 F.2d 451, 457 (4th Cir. 1979). However, as opposed to cross-examination, a defendant has no right to recross-examination unless the examination addresses a new matter brought out for the first time on redirect examination. *Commonwealth* v. *Wilson,* 381 Mass. 90, 119 (1980). *Commonwealth* v. *Pickles,* 364 Mass. 395, 401 (1973). *Commonwealth* v. *Gordon,* 356 Mass. 598, 602 (1970). *Commonwealth* v. *Riley,* 17 Mass. App. Ct. 950, 952 (1983). See *United States* v. *Ross,* 33 F.3d 1507, 1518 (11th Cir. 1994), cert. denied, 115 S. Ct. 2558 (1995); *United States* v. *Caudle, supra* at 457-458. If the recross-examination proposes to enter new territory not raised on redirect, the trial judge has discretion in determining whether to allow the examination. *Commonwealth* v. *Gordon, supra. Commonwealth* v. *Riley, supra.* See *United States* v. *Baker,* 10 F.3d 1374, 1404 (9th Cir. 1993), cert. denied, 115 S. Ct. 330 (1994); *United States* v. *Riggi,* 951 F.2d 1368, 1374-1375 (3d Cir. 1991). A ruling by a trial judge in this situation is given substantial weight by an appellate court. *Commonwealth* v. *Berth,* 385 Mass. 784, 790 (1982).

The questions asked by the prosecutor on redirect examination regarding Shanahan's state of mind at the time she gave her October 7 statement were entirely proper in that they sought to explain the circumstances surrounding the making of a statement which had been used to impeach the witness on cross-examination. "One purpose of redirect examination is to allow a witness to 'explain, correct or modify the evidence elicited from .´. . [him] on cross by the defendant." *Commonwealth* v. *Caine,* 366 Mass. 366, 368-369 (1974), quoting *Commonwealth* v. *Galvin,* 310 Mass. 733, 747 (1942). "A witness who has been impeached by a prior inconsistent statement may explain *why* he has made inconsistent statements" (emphasis supplied). *Commonwealth* v. *Errington,* 390 Mass. 875, 880 (1984). The questions which defense counsel proposed to ask on recross-examination involved an entirely separate statement, a statement which was not brought out at any point on direct, cross, or redirect ex-

amination. He asked no question pertaining directly to her alleged state of mind. While it is true that had the defendant been permitted to recross-examine Shanahan on the second statement, her testimony might have been impeached, this possibility does not affect the outcome of this issue. See *Commonwealth* v. *Cefalo*, 381 Mass. 319, 334-335 (1980) (judge did not abuse discretion in disallowing question on recross-examination whose answer might have impeached prosecution's witness).

The defendant had every opportunity to examine Shanahan regarding the second statement during the original cross-examination. Counsel's conduct in not taking that opportunity may have been an unfortunate tactical decision, but such a decision cannot now be considered a constitutional error on the judge's part. *United States* v. *Pina*, 974 F.2d 1241, 1245 (10th Cir. 1992).

2. *Recollection refreshed.* The defendant argues that the trial judge erred when he refused the defendant's request that he be allowed to inspect a document used by the prosecution to refresh the recollection of Carol Shanahan during her testimony at trial. The judge refused the request apparently on the ground that the document constituted the prosecutor's protected work product and therefore was not subject to disclosure.[4]

We conclude that the judge erred in denying the defendant's request to inspect the document. However, the defendant failed adequately to preserve this issue for appellate review when he neglected to ensure that the document used to refresh Shanahan's testimony was marked for identification. Thus, because the document in question is not part of the record before us we have no way of determining whether the defendant was prejudiced by the judge's error. *Commonwealth* v. *Hall*, 369 Mass. 715, 724-725 (1976). See *Commonwealth* v. *Borans*, 379 Mass. 117, 153 (1979). See also

---

[4]The prosecutor described the document as her own notes taken during an interview with the witness. We shall assume, for purposes of discussion, that the prosecutor's notes fell within the work product rule.

*Commonwealth* v. *Lewinski*, 367 Mass. 889, 901 (1975). Although we deny the defendant's request that we order a reversal of his conviction on this point, we believe a discussion of the issue is appropriate as it has never been directly addressed by an appellate court in this Commonwealth and some guidance may help prevent future uncertainty in the trial courts.

In Massachusetts, it has long been an established rule in both civil and criminal practice that an examiner may refresh the recollection of a witness during her testimony. *Commonwealth* v. *Cheek*, 374 Mass. 613, 617-618 (1978). Although a writing of some variety is usually employed in this procedure, the examiner may use any other means. See *id.*; *United States* v. *Riccardi*, 174 F.2d 883 (3d Cir.), cert. denied, 337 U.S. 941 (1949). The only prerequisite to refreshing recollection is a showing that the witness's memory is clearly exhausted. *Commonwealth* v. *Baldwin*, 385 Mass. 165, 178-179 (1982). The opposing party is not entitled to inspect the writing prior to its being shown to the witness but he or she is entitled to an inspection after it is shown to the witness and before cross-examination. *Commonwealth* v. *Greenberg*, 339 Mass. 557, 581 (1959). See *Leonard* v. *Taylor*, 315 Mass. 580, 583 (1944); *Bendett* v. *Bendett*, 315 Mass. 59, 62 (1943). Although these evidentiary rules are well settled in Massachusetts, a conflict may arise, as it did in this case, when the party in possession of the writing used to refresh the witness's recollection claims that disclosure of its contents is not required because the writing contains material protected by the work product doctrine.

It is our opinion that, when materials protected by the work product doctrine are used by the examiner to refresh a witness's recollection on the stand, the protection afforded by the work product doctrine is waived and the opponent's attorney is entitled to inspect the writing. We reach this conclusion after a careful survey of the issue as approached by other jurisdictions, both State and Federal. We are also persuaded in deciding this issue by the basic judicial objectives of fairness and the determination of truth.

Rule 612 of the Federal Rules of Evidence provides that, "if a witness uses a writing to refresh memory . . . while testifying . . . an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." Although the rule does not address itself directly to the issue of writings protected by the work product doctrine, Federal courts have held that the use of protected writings to refresh memory on the stand constitutes a waiver of that protection and the material used to refresh memory must be shown to the opposing party if requested.[5] See, e.g., *Derderian* v. *Polaroid Corp.,* 121 F.R.D. 13, 15-16 (D. Mass. 1988); *S & A Painting Co.* v. *O.W.B. Corp.,* 103 F.R.D. 407, 409 (W.D. Pa. 1984). *James Julian, Inc.* v. *Raytheon Co.,* 93 F.R.D. 138, 144-145 (D. Del. 1982); *Marshall* v. *United States Postal Serv.,* 88 F.R.D. 348, 350 (D.D.C. 1980); *Bailey* v. *Meister Brau, Inc.,* 57 F.R.D. 11, 13 (N.D. Ill. 1972). Rule 612 of the Proposed Massachusetts Rules of Evidence is identical in all relevant respects to Fed. R. Evid. 612, which a majority of the States have adopted. Many others have adopted the similar Rule 612 of the Uniform Rules of Evidence, 13A U.L.A. 966 (1994). The few State courts that have addressed the issue of the conflict between the rule and protected documents used while the witness is on the stand have reached conclusions similar to the Federal courts, i.e., that use of protected material to refresh a witness's recollection on the stand constitutes waiver of that protection.[6]

---

[5]This fact is so well established in the case law interpreting rule 612 that often the issue is passed over with only a brief comment supporting the conclusion that such use of a protected document constitutes a waiver. Presently, the more controversial issue, and the one on which the courts are still somewhat unclear, is whether an adverse party has a right under rule 612 to inspect protected and privileged documents used by the witness to refresh her recollection *prior* to testifying. We leave for another day our determination of the rights of the parties in that situation.

[6]See, e.g., *Samaritan Health Servs., Inc.* v. *Superior Court,* 142 Ariz. 435, 438 (1984) (use of interview summaries to refresh recollection prior to deposition amounted to waiver of attorney-client privilege and work

The Commonwealth argues that the protection provided by the work-product doctrine "trumps" the right to inspect documents used to refresh memory on the stand. We disagree.[7] One "can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination." *United States* v. *Nobles*, 422 U.S. 225, 240 (1975). It is clear to us that a rule against disclosure in these circumstances would impair the fairness of the trial process. For example, examining counsel might choose only protected materials to refresh a witness's recollection in order to avoid a potentially damaging cross-examination by opposing counsel. There is also, obviously, the danger of witness prompting by examining counsel.[8] Without the right to inspect the protected writing, opposing counsel would have no opportunity to cross-examine the witness as to the accuracy of the writing and its effect on his or her memory. Results such as these would go a long way toward impairing the judicial process and are therefore clearly unacceptable.

*Judgment affirmed.*

product protection); *Summerlin* v. *State*, 256 Ind. 652, 659 (1971) (work product protection of memorandum waived when used to refresh recollection of testifying witness); *Herrmann* v. *General Tire & Rubber Co.*, 79 A.D.2d 955, 956 (N.Y. 1981) (work product protection of tape recording waived when it was used to refresh recollection of witness prior to deposition); *E.R. Carpenter Co.* v. *ABC Carpet Co.*, 98 Misc. 2d 1091, 1092-1093 (N.Y. Civ. Ct. 1979) (discovery of privileged memorandum used to refresh witness's memory prior to deposition allowed); *Farm Credit Bank* v. *Huether*, 454 N.W.2d 710, 718 (N.D. 1990) (attorney-client privilege waived when letter from witness to attorney was used to refresh the witness's testimony at trial).

[7]See note 6, *supra*.

[8]For good discussions of the danger of witness prompting by counsel, see 3 J. Wigmore, Evidence § 762 (Chadbourn rev. ed. 1970); Note, Interactions Between Memory Refreshment and Work Product Protection Under the Federal Rules, 88 Yale L.J. 390, 402-403 (1978).

O'CONNOR, J. (dissenting, with whom Wilkins and Greaney, JJ., join). Darlene, a sister of the infant victim's mother, testified that, in the evening, after the mother had left the family's apartment, the infant cried and vomited on the defendant's shoulder, and that the defendant got a "mean" look on his face and threw the infant in the air. Darlene also testified that the infant hit the floor, making a "loud noise" when he landed. As the court notes, ante at 471 n.1, the defendant's theory of the case at trial was that the injury occurred earlier in the day while the defendant was playing with the infant on the living room floor; that the defendant "flipped the [infant] while holding his hands and that [the infant] accidentally slipped and landed on the floor." It was important to the defense that Darlene's testimony be impeached, as it would have been if the jury had heard that the infant showed symptoms of head injury before the infant's mother left the apartment.

"The defendant claims that the 'cold' symptoms observed by [the mother] and other witnesses were actually symptoms of a head injury. Therefore, the defendant argues, the issue of when [the infant's] 'cold' symptoms appeared was crucial to the defense." Ante at 474. If the symptoms appeared before the mother left the apartment in the evening, that would suggest that the fatal incident did not occur when and as described by Darlene, but that it occurred earlier in the day in conformity with the defendant's theory of the case.

As the court notes, "Under cross-examination, [the mother] testified, consistent with her testimony on direct examination, that she did not see [the infant] on October 2, 1987, from the time she left for work in the morning until around dinner time. When she saw him, [the infant] appeared to have a runny nose but exhibited no other cold symptoms. Defense counsel asked [the mother] whether she remembered making a statement to the police shortly after [the infant's] death in which she stated that when she got home with Darlene in the afternoon the two of them looked in on [the infant] and that he appeared to have a cold, and that he was wheezing and gasping and sounded hoarse. [The

mother] testified that, while she remembered making a statement to the police, she could not remember stating that she checked on [the infant] in the afternoon or that he appeared to have had a cold at that time. On being shown her written statement to police made following [the infant's] death, [the mother] repeated that she could not recall stating she had checked on [the infant] in the afternoon." *Ante* at 474-475.

At that juncture, the message to the jury was that the mother's testimony that she first saw the "head injury" symptoms in the evening, thus supporting the Commonwealth's case, was inconsistent with her October 7, 1987, statement to the police, when her memory was fresh and distortion of the truth was less likely. The October 7 statement tended to support the defense theory. In those circumstances, defense counsel had no need to refer to a second statement, similar to the first, which the mother gave to the police many months after the first statement was made. Counsel's point had been made. Counsel had no reason, as the defendant's representative, to explore with the mother possible explanations for her inconsistency. Furthermore, counsel was in no position to predict the explanation, if any, that would be elicited by the prosecutor's redirect examination, or to pose appropriate anticipatory questions designed to test the validity of the yet-to-be-given explanation. Counsel had a right, in my view, to assume that, if an explanation were to be presented in the course of redirect examination, his exploration of that new matter would be available by recross-examination.

Indeed, on redirect examination, an explanation was forthcoming. In response to the prosecutor's questions, the mother testified that on October 7, the day on which she gave her statement to the police, which was just one day after her baby was buried, she was upset. The obvious implication was that the statement was the product of that mental condition, that it was incorrect, and that her testimony, not the statement, should be credited by the jury. Then, for the first time, on recross-examination, defense counsel had a reason — a need — and therefore a realistic opportunity (if his questions

had been allowed) to ask the witness mother whether, at a later time, when she was not upset, she gave a statement not substantially different from her statement on October 7.

As the court indicates, on the prosecutor's objection the "judge precluded defense counsel from asking [the mother] about the contents of the second statement, which was not in evidence, ruling that it did not address a new matter raised on redirect." *Ante* at 475. The judge rejected defense counsel's sidebar argument that, since the prosecutor had attempted to rehabilitate the witness by bringing out her mental state when she gave the October 7 statement, defense counsel should be allowed "to show that subsequent to that [she] had the exact same confusion, so that her explanation doesn't meet the problem." Defense counsel's obvious point was that his client was entitled to have the jury know that the mother's second statement[1] was similar to the first one, from which the jury might infer that the first statement was not the product of an upset mind as claimed for the first time on redirect, but instead spoke the truth and revealed the falsity of the mother's testimony concerning the all-important question of when the "cold" symptoms first appeared.

The court "conclude[s] that the judge acted within his sound discretion in ruling that the matter on which the defendant sought to examine [the mother] was not a new matter raised for the first time on redirect examination of the witness. Therefore, the defendant had no right to recross-examine her on the statement as it was beyond the scope of redirect examination." *Ante* at 475. I disagree.

"There are few subjects, perhaps, upon which [the Supreme] Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *United States* v. *Caudle*, 606 F.2d 451, 457 (4th Cir. 1979), quoting *Pointer* v. *Texas*, 380 U.S. 400, 405 (1965). As Wigmore states, cross-exami-

---

[1]The mother's second statement was marked for identification.

nation "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore, Evidence § 1367 (Chadbourne rev. ed. 1976), quoted in *United States* v. *Caudle, supra.* Its effectiveness in probing the truth and completeness of testimony is "so well understood that the right of cross-examination is 'one of the safeguards essential to a fair trial.'" *United States* v. *Caudle, supra,* quoting *Alford* v. *United States,* 282 U.S. 687, 692 (1931).

All the reasons provided to support the right of cross-examination "apply with equal strength to recross-examination where new matter is brought out on redirect examination." *United States* v. *Caudle, supra* at 457-458. See *United States* v. *Riggi,* 951 F.2d 1368, 1375 (3d Cir. 1991). Accord *United States* v. *Baker,* 10 F.3d 1374, 1404-1405 (9th Cir. 1993), cert. denied, 115 S. Ct. 330 (1994); *United States* v. *Ross,* 33 F.3d 1507, 1518 (11th Cir. 1994), cert. denied, 115 S. Ct. 2558 (1995). See *Commonwealth* v. *Pickles,* 364 Mass. 395, 401 (1973); *Commonwealth* v. *Gordon,* 356 Mass. 598, 602 (1970).

In my view, it is abundantly clear that material new matters were brought out on redirect examination of the victim's mother, namely, that when she gave her statement to the police on October 7, which was inconsistent with her testimony concerning the important question as to when the infant's symptoms first appeared, she was upset by the very recent traumatic events. The implication was that the statement should be dismissed and the testimony should be credited. That mental state evidence was injected into the case for the first time on the prosecutor's redirect examination of the witness. It was critical, and the defendant was constitutionally entitled to cross-examine with respect to it.

The court states, *ante* at 476-477, "The questions which defense counsel proposed to ask on recross-examination involved an entirely separate statement, a statement which was not brought out at any point on direct, cross, or redirect examination." The court misses the point. The material new matter which was brought out for the first time on redirect examination was not the mother's second statement, but was the witness mother's upset state of mind when she gave her

first statement, brought out to reduce that statement's impact. Defense counsel's questions on recross-examination, asked at the earliest opportunity, were designed to counter the thrust of the new material that had just been introduced by the prosecutor.

Efficiency and expedition in the conduct of trials is desirable — but not at the expense of truth. Recross-examination as to new material matters is essential to the truth-finding process. It was disallowed in this case. The judgment should be set aside and the case should be remanded for a new trial.