USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1979

 ROBERT O'BRIEN,

 Petitioner, Appellant,

 v.

 LARRY E. DUBOIS,

 Respondent, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 

 Robert L. Sheketoff, with whom Sheketoff & Homan was on brief,
for appellant.
 William J. Meade, Assistant Attorney General, Commonwealth of
Massachusetts, with whom Scott Harshbarger, Attorney General, was
on brief, for appellee.

May 26, 1998

 
 SELYA, Circuit Judge. In this pathbreaking case,
petitioner-appellant Robert O'Brien, who assails his Massachusetts
manslaughter conviction on the ground that the trial court
unconstitutionally restricted recross-examination, prays for a writ
of habeas corpus. Evaluating the petitioner's claim requires us to
appraise and interpret the standard of review provision
incorporated into 28 U.S.C. 2254(d)(1) by the Antiterrorism and
Effective Death Penalty Act of 1996. After developing and applying
an appropriate analytic framework, we uphold the district court's
denial of habeas relief.
I. BACKGROUND
 Our factual recitation focuses primarily on the trial
testimony and rulings that lie at the epicenter of this habeas
proceeding. We direct readers who yearn for a more complete
narrative to the opinion of the Massachusetts Supreme Judicial
Court (SJC) affirming the underlying conviction. See Commonwealthv. O'Brien, 645 N.E.2d 1170, 1171-74 (Mass. 1995).
 On March 29, 1989, a state jury convicted the petitioner
of the involuntary manslaughter of Sean Patrick Shanahan, a five-
month-old infant. The criminal case arose after Sean's mother,
Carol Shanahan, found the child dead in his crib and an autopsy
indicated that Sean perished as a result of blunt head trauma.
 In the relevant time frame, the petitioner lived with
Shanahan and her three children (Sean included). Sean's parentage
was an ongoing source of friction in what charitably can be called
a stormy relationship. The record evinces that the petitioner
singled out Sean for frequent scoldings and occasional physical
abuse.
 On the morning of October 2, 1987, Shanahan left the
couple's apartment to report for work. She returned home at about
4:00 p.m., accompanied by her eight-year-old sister, Darlene. 
Shanahan testified that Sean awoke while she was preparing the
evening meal, and that he appeared normal except for a runny nose. 
After dinner, the petitioner ordered Shanahan to purchase some
marijuana for him. Shanahan absented herself from the apartment
for approximately fifteen minutes to perform this errand. The
petitioner remained on the premises with Shanahan's sister and
three children.
 What happened next is hotly disputed. The prosecution
relied on Darlene as its star witness at trial, and we summarize
her account of the pertinent events: During Shanahan's absence,
Sean awoke and began crying. The petitioner picked him up and
headed for the kitchen. Sean vomited. The petitioner became
angry, hurled Sean into the air, and unsuccessfully tried to catch
him. Sean struck the floor headfirst. The petitioner then
restored the crying child to his crib and advised Darlene not to
discuss what had happened lest he "get someone after [her]." When
Shanahan returned, no one mentioned the incident.
 There is little disagreement as to subsequent events. 
Later that evening, Shanahan noticed that Sean's face was puffy,
his eyes runny, and his breathing strained. These symptoms
persisted the next morning, prompting Shanahan to leave Sean in his
crib for the day. That night, Shanahan moved toward Sean's room to
check his condition, but the petitioner headed her off and entered
the room first. After a few seconds, he emerged, pointed toward
the crib, and fled the apartment. Shanahan approached the crib and
found the child dead.
 The state police investigation immediately focused on the
petitioner. At first, he denied any involvement with Sean's death,
but, upon requestioning, he changed his tune. This time, the
petitioner claimed that, on October 2, he had slipped while
carrying Sean, and that Sean's head and neck had struck the floor
during the ensuing fall. The investigating officer consulted with
the pathologist who performed the autopsy and ascertained that
Sean's injuries could not have occurred in this manner. Confronted
with the pathologist's statement, the petitioner agreed to tell the
investigator "what really happened." He then spun a new yarn: 
while playing with Sean on the morning of October 2, he had placed
his hands under Sean's legs, held the child by the hands, and tried
to flip him but Sean slipped from his grasp and the child's head
hit the floor.
 At trial, the prosecution's theory of the case tracked
Darlene's account of how Sean's injuries transpired. To refute
this testimony and buttress his (most recent) version of the events
surrounding Sean's death, the petitioner strove to show that Sean
exhibited symptoms of a head injury prior to the time that Darlene
claimed to have seen the petitioner heave the baby into the air. 
Given the nature of this defense, the presence of so-called cold
symptoms before dinner on October 2 symptoms that the petitioner
insists were in fact indicia of cranial trauma took on vital
importance.
 In the course of a vigorous cross-examination, Shanahan
testified that she did not see Sean from the time she left for work
on October 2 until late in the afternoon, and that he had a runny
nose but no other cold symptoms at that juncture. She first
noticed that Sean was not feeling well later that evening. The
petitioner's counsel called Shanahan's attention to a statement
that she gave to the police on October 7, in which she reported
that, upon arriving at the apartment with Darlene, she noticed that
Sean displayed some other symptoms (like hoarseness and wheezy
breathing). Shanahan replied that she could not remember making
these specific comments.
 The prosecution, in an attempt to account for any
possible discrepancies between Shanahan's trial testimony and her
pretrial statement, elicited on redirect examination that she had
been extremely upset when she gave the October 7 statement because
Sean's funeral had occurred the day before. On recross-
examination, defense counsel sought to ask Shanahan about another
statement that she penned some days after the funeral in
preparation for a meeting with a prosecutor (and in which,
according to the petitioner's attorney, Shanahan again recounted
that she observed Sean suffering from cold symptoms as soon as she
and Darlene returned home). The prosecution objected on the ground
that the proposed questioning exceeded the scope of redirect
examination. The petitioner's counsel countered that a reference
to the second statement was proper because it impeached Shanahan's
explanation for the inconsistency between her trial testimony and
her October 7 account. The trial judge sustained the objection,
finding that the contents of the second statement (which had not
been admitted into evidence) did not address any matter raised for
the first time on redirect examination.
 The jury convicted the petitioner of involuntary
manslaughter. After an intermediate appellate court rejected the
petitioner's appeal, the SJC, in a four-to-three decision, held
that the imposed limitation on recross-examination did not
transgress the Confrontation Clause. See O'Brien, 645 N.E.2d at
1174.
 On July 15, 1996, the petitioner filed an application for
habeas relief in the United States District Court for the District
of Massachusetts. Judge Woodlock recognized that the new habeas
review standards contained in the Antiterrorism and Effective Death
Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996)
(codified in scattered sections of 28 U.S.C.) (AEDPA), governed the
resolution of the petitioner's case. See Lindh v. Murphy, 117 S.
Ct. 2059, 2063 (1997); Rodriguez v. Superintendent, ___ F.3d ___,
___ (1st Cir. 1998) [No. 97-8068, slip op. at 4]. Applying AEDPA's
standard of review provision, 28 U.S.C. 2254(d)(1) (Supp. 1996),
Judge Woodlock denied relief. He then issued a certificate of
appealability, and we followed suit. See 28 U.S.C. 2253(c)(1).
II. ANALYSIS
 While the substance of the petitioner's claim awaits, we
must interpret what is perhaps the most fundamental modification to
habeas corpus jurisprudence wrought by AEDPA the fashioning of a
neoteric standard that a federal habeas court must use when
assessing a state court's adjudication of a criminal defendant's
assertions of constitutional error.
 AEDPA instructs federal courts not to grant a writ of
habeas corpus at the behest of a state prisoner unless the
underlying state adjudication:
 (1) resulted in a decision that was contrary
 to, or involved an unreasonable application of,
 clearly established Federal law, as determined
 by the Supreme Court of the United States; or
 (2) resulted in a decision that was based on an
 unreasonable determination of the facts in
 light of the evidence presented in the State
 court proceeding.

28 U.S.C. 2254(d). AEDPA is hardly a model of clarity, seeLindh, 117 S. Ct. at 2068 (observing that "in a world of silk
purses and pigs' ears, [AEDPA] is not a silk purse of the art of
statutory drafting"), and its standard of review provision is far
from self-explicating. The provision poses particular difficulties
in determining the appropriate mode of analysis that a federal
court should pursue under subsection (1) difficulties that we
encounter here.
 A.
 Before turning to our central interpretive task, we deem
it advisable to clear some of the statutory underbrush. Prior to
AEDPA's passage, a federal court's exercise of habeas corpus
jurisdiction did not require that it pay any special heed to the
underlying state court decision. See, e.g., Brown v. Allen, 344
U.S. 443, 458 (1953) (remarking that the habeas court treats the
state court decision as nothing more than "the conclusion of a
court of last resort of another jurisdiction"); Scarpa v. Dubois,
38 F.3d 1, 9 (1st Cir. 1994) (similar). In contrast, the AEDPA
amendments to section 2254 exalt the role that a state court's
decision plays in a habeas proceeding by specifically directing the
habeas court to make the state court decision the cynosure of
federal review. See James S. Liebman & Randy Hertz, Federal Habeas
Corpus Practice and Procedure 30.2c, at 305 (Supp. 1997). Only
if that decision deviates from the paradigm described in section
2254(d) can a habeas court grant relief.
 In terms, section 2254(d)(1) limits the benchmark
precedent against which a habeas court may measure a state court
decision to "clearly established Federal law, as determined by the
Supreme Court of the United States." Thus, even if lower federal
court decisions support the petitioner's position or adumbrate the
emergence of a rule favorable to him, the writ cannot issue unless
the state court decision contravenes, or involves an unreasonable
application of, extant Supreme Court jurisprudence. See Sweeney v.
Parke, 113 F.3d 716, 718 (7th Cir. 1997); Moore v. Calderon, 108
F.3d 261, 264-65 (9th Cir.), cert. denied, 117 S. Ct. 2497 (1997);
Childress v. Johnson, 103 F.3d 1221, 1225 (5th Cir. 1997). This is
not to say that the jurisprudence of inferior federal courts is
entirely irrelevant in the modern habeas milieu; the decisions of
such tribunals may very well achieve decretory significance in
determining whether a state court's "application of . . . clearly
established Federal law, as determined by the Supreme Court of the
United States," is reasonable. 28 U.S.C. 2254(d)(1). Withal,
this role is circumscribed and cannot be scripted to countenance
expedient circumvention of AEDPA's express prohibition on grounding
habeas relief in rules created by the lower federal courts.
 B.
 Preliminaries aside, the principal interpretive question
posed by this case can be succinctly stated: What does it mean for
a state adjudication to be "contrary to" or to involve "an
unreasonable application of" clearly established Supreme Court law? 
Embedded in the resolution of this question is an issue of
considerable constitutional import: the degree, if any, to which
AEDPA infringes on a federal habeas court's ability independently
to interpret federal law (and, particularly, federal constitutional
doctrine). Courts and commentators have offered several possible
interpretations of section 2254(d)(1), ranging from utter
capitulation that is, a unitary standard of deference to a state
court's reasonable elucidations and applications of constitutional
principles in individual cases, see, e.g., Perez v. Marshall, 946
F. Supp. 1521, 1532-33 (S.D. Cal. 1996), appeal denied, 121 F.3d
716 (9th Cir. 1997) (table) to a middle-of-the-road approach 
that is, a bifurcated standard that applies the "contrary to"
language to issues of law and the "unreasonable application"
language to mixed questions, see, e.g., Neelley v. Nagle, 138 F.3d
917, 924 (11th Cir. 1998); Drinkard v. Johnson, 97 F.3d 751, 767-68
(5th Cir. 1996), cert. denied, 117 S. Ct. 1114 (1997) to a
minimalist approach, urged by some academics, that clings closely
to the past that is, a focus-shifting standard that construes
AEDPA as merely directing attention initially to the state court's
decision but otherwise leaving the habeas court free to grant the
writ whenever it finds a petitioner's claim meritorious, see, e.g.,
Larry Yackle, A Primer on the New Habeas Corpus Statute, 44 Buff.
L. Rev. 381, 412 (1996). We are not fully persuaded by any of
these multifarious formulations.
 The first formulation a standard of across-the-board
deference portends a serious constitutional conflict. If, under
section 2254(d)(1), a federal court must "defer" to a state court's
determinations anent federal law, AEDPA may intrude impermissibly
upon the federal courts' Article III power "not merely to rule on
cases, but to decide them." Plaut v. Spendthrift Farm, Inc., 514
U.S. 211, 218-19 (1995) (emphasis omitted). This concern is enough
in itself to warrant favoring some other, equally plausible
interpretation. See Edward J. DeBartolo Corp. v. Florida Gulf
Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988);
United States v. Gifford, 17 F.3d 462, 473 (1st Cir. 1994).
 We hasten to add, however, that this constitutional
tension is not the sole reason for rejecting uniform deference. 
AEDPA's legislative history, especially the dialogue during floor
debates, indicates beyond peradventure that Congress did not intend
to strip federal courts of their authority independently to assess
the merits of federal questions raised in habeas petitions. SeeGreen v. French, ___ F.3d ___, ___ (4th Cir. 1998) [1998 WL 237506,
at *8]; Liebman & Hertz, supra, at 308 n.32 (cataloguing various
statements); see also Yackle, supra, at 422-23 (observing that
congressional proponents of a rule of deference explicitly
abandoned this position to secure passage of habeas reform). These
floor statements are wholly consistent with AEDPA's statutory text,
which contains no clearcut command that habeas courts "defer" to
state court decisions. This consistency imbues the floor
statements with interpretive significance. See Brock v. Pierce
County, 476 U.S. 253, 263 (1986) (holding that floor statements are
valid indicators of congressional intent to the extent that they
"are consistent with the statutory language"); cf. Regan v. Wald,
468 U.S. 222, 237 (1984) (observing that floor colloquies cannot
serve to alter unambiguous statutory language). In the same vein,
the Senate specifically rejected a proposal that would have given
state court decisions res judicata effect in federal habeas
proceedings. See 141 Cong. Rec. S7849 (daily ed. June 7, 1995).
 The second formulation a bifurcated standard championed
by the Fifth and Eleventh Circuits reads too much into the text
of the statute. Section 2254(d)(1) simply does not speak of
"questions of law" or "mixed questions of law and fact." Adherents
of this approach excuse their embroidery of the statute's text,
saying that it is fair to assume that Congress had this division in
mind because prior habeas jurisprudence fleetingly suggested such
a distinction. We think that this blithe assumption is
unwarranted. At best, the Court's pre-AEDPA signals on this point
are mixed. Compare Wright v. West, 505 U.S. 277, 294 (1992)
(plurality opinion suggesting distinction) with Thompson v.
Keohane, 116 S. Ct. 457, 464 (1995) (observing that mixed questions
of law and fact are treated as legal questions for purposes of
habeas review). In all events, courts should tred gingerly before
inserting words into a statute's text, see Water Quality Ass'n v.
United States, 795 F.2d 1303, 1309 (7th Cir. 1986), and the caution
light glows with particular brilliance here. Common sense suggests
that, had Congress desired to adopt this highly specific taxonomy,
it could and would have drafted AEDPA in more explicit terms. SeeGreen, ___ F.3d at ___ [1998 WL 237506, at *3-4] (noting that the
terms "contrary to" and "unreasonable application of" are not
amenable to precise definitional distinction).
 Were this not enough reason to shun the bifurcated
approach, AEDPA's legislative history supplies the sockdolager. 
The House of Representatives proposed a formulation closely akin to
the bifurcated approach, but Congress rejected it. It would be
unseemly and wrong for a court to scavenge discarded language
from the legislative scrap heap and graft such language onto the
version of the bill that Congress ultimately enacted. See Loncharv. Thomas, 116 S. Ct. 1293, 1300 (1996) (avoiding a reading that
would have imposed a requirement in the habeas context that
Congress "rejected, by removing [the requirement] from the draft
Rule" (emphasis in original)); see also Rhode Island v.
Narragansett Indian Tribe, 19 F.3d 685, 700 (1st Cir. 1994) ("When
Congress includes limiting language in an early version of proposed
legislation, and then rewrites the bill prior to enactment so as to
scrap the limitation, the standard presumption is that Congress
intended the proviso to operate without limitation."). Thus, in
light of the documented legislative rebuff, the bifurcated approach
fails. 
 The third formulation a focus-shifting approach 
suffers from a different, but equally debilitating infirmity. The
argument in support of the approach holds that the disjunctive
phrasing of section 2254(d)(1), literally read, furnishes habeas
petitioners with a choice to seek review of their convictions under
either the "unreasonable application" clause or the "contrary to"
clause. This interpretation effectively reads the "unreasonable
application" language out of the statute, for that language sounds
much more tolerant of state courts' rulings than does the "contrary
to" language, and, thus, no rational petitioner would opt for it in
practice. See Drinkard, 97 F.3d at 767; see also Sharad Sushil
Khandelwal, Note, The Path to Habeas Corpus Narrows: Interpreting
28 U.S.C. 2254(d)(1), 96 Mich. L. Rev. 434, 447 (1997). Indeed,
proponents of the focus-shifting approach unabashedly admit that
their formulation nullifies the statute's "unreasonable
application" language. See Mark Tushnet & Larry Yackle, Symbolic
Statutes and Real Laws: The Pathologies of the Antiterrorism and
Effective Death Penalty Act and the Prison Litigation Reform Act,
47 Duke L.J. 1, 44 (1997).
 The minimalist focus-shifting approach substitutes the
proponents' policy choices for the legislative will, and is
therefore unacceptable. Statutory interpretation is not a game
designed to find linguistic loopholes as a means to subverting
Congress's discerned intentions. Rather than reading words out of
a statute, courts should strive to give every word in a statute
meaning and effect. See United States v. Nordic Village, Inc., 503
U.S. 30, 36 (1992); United States v. Ven-Fuel, Inc. 758 F.2d 741,
751-52 (1st Cir. 1985). So it is here: we must interpret section
2254(d)(1) in such a way as to give purpose to both of its clauses.
 Time often lends perspective. Given the opportunity to
study AEDPA and to digest what other courts and commentators have
written, we believe that a better reading of the statute's standard
of review provision is available. Although AEDPA did not codify
the Teague approach to habeas review wholesale, see Rodriguez, ___
F.3d at ___ [slip op. at 11], the amendments to section 2254(d)(1)
plainly embrace one of Teague's primary goals. Teague taught that,
apart from the Supreme Court, federal habeas courts ought not act
as innovators in the field of criminal procedure, thereby upsetting
state convictions because state courts were not prescient and thus
failed to comply with federal law that did not exist at the time
they ruled. See Gray v. Netherland, 116 S. Ct. 2074, 2083 (1996);
Saffle v. Parks, 494 U.S. 484, 488 (1990). Congress chose to
perpetuate this view by codifying in section 2254(d)(1) a sort of
choice-of-law provision that restricts the armamentarium of legal
rules available to a federal habeas court in evaluating a state
court judgment. See Green, ___ F.3d at ___ [1998 WL 237506, at
*8]. This approach closely emulates Teague. See Wright, 505 U.S.
at 303-05 (O'Connor, J., concurring); see also Hogan v. Hanks, 97
F.3d 189, 192 (7th Cir. 1996) (drawing comparisons between Teague's
and AEDPA's views of the appropriate role of a federal habeas
court), cert. denied, 117 S. Ct. 1439 (1997); Note, Rewriting the
Great Writ: Standards of Review for Habeas Corpus Under the New 28
U.S.C. 2254, 110 Harv. L. Rev. 1868, 1883 (1997) (similar).
 To be sure, the symmetry between Teague and AEDPA is not
perfect. After all, section 2254(d)(1)'s precedent-limiting aspect
functions more strictly than did Teague's in that it confines the
set of relevant rules to those "clearly established by the Supreme
Court," whereas Teague tolerated a broader compass. See, e.g.,
Ciak v. United States, 59 F.3d 296, 302-03 (2d Cir. 1995) (holding
that Teague's "new rule" ban does not proscribe application of a
rule well-established under circuit precedent, even if Supreme
Court jurisprudence contains no precise analog). Nonetheless, the
general approach to habeas review exhibited by Teague and AEDPA is
quite similar.
 This understanding leads us to adopt an analytic
framework that animates section 2254(d)(1)'s directive that a
federal habeas court issue the writ when a state court produced "a
decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States." Our interpretation yields
a comfortable fit with both the statutory language and the
legislative history, and minimizes constitutional concerns. A
federal habeas court charged to weigh a state court decision must
undertake an independent two-step analysis of that decision. 
First, the habeas court asks whether the Supreme Court has
prescribed a rule that governs the petitioner's claim. If so, the
habeas court gauges whether the state court decision is "contrary
to" the governing rule. In the absence of a governing rule, the
"contrary to" clause drops from the equation and the habeas court
takes the second step. At this stage, the habeas court determines
whether the state court's use of (or failure to use) existing law
in deciding the petitioner's claim involved an "unreasonable
application" of Supreme Court precedent. See Liebman & Hertz,
supra, 30.2c, at 310. Ironically, it is the "clearly
established" qualifier that will present the most difficulty when
applying this framework to particular cases. In this regard, the
chief question is how specific a rule must be to qualify as
dispositive, thus triggering review under the "contrary to" clause. 
This type of inquiry is hardly foreign to federal judges; most
notably, it lurks in both the jurisprudence of the qualified
immunity doctrine, see, e.g., Anderson v. Creighton, 483 U.S. 635,
639-40 (1987), and in the Teague refinements to habeas review, see,
e.g., Gray, 116 S. Ct. at 2083-84; Fern v. Gramley, 99 F.3d 255,
258 (7th Cir. 1996).
 We deem the qualified immunity concept of "clearly
established" a siren's call for purposes of fleshing out section
2254(d)(1); the invitation is enchanting, but the consequences of
acceptance are potentially disagreeable. The judge-made qualified
immunity doctrine strikes a balance between remedying
constitutional violations and unduly hindering state actors'
abilities to perform their jobs on a day-to-day basis by shielding
them from liability for money damages unless their conduct
transgresses the most firmly settled constitutional norms. SeeRyder v. United States, 515 U.S. 177, 185 (1995); Harlow v.
Fitzgerald, 457 U.S. 800, 814 (1982). In contrast, state judges do
not face personal liability for erroneous constitutional decisions
 a bruised ego is not the functional equivalent of a monetary
award. More importantly, the legislatively enacted AEDPA standard
is not designed to strike a balance between such values, but to
provide a means for testing the conformity of a state court's
decision to the requirements of federal law. In light of these
salient differences, it follows that a rule need not be quite as
clear or a precedent as factually specific to rate review under the
"contrary to" clause of section 2254(d)(1) as it must be to hold a
state actor liable for damages under section 1983. See Evan Tsen
Lee, Section 2254(d) of the New Habeas Statute: An (Opinionated)
User's Manual, 51 Vand. L. Rev. 103, 127-29 (1998); Tushnet &
Yackle, supra, at 43 n.219. To avoid reducing the AEDPA standard
to a rubber stamp, the term "clearly established," as used by
Congress in section 2254(d)(1), must cut a wider swath. 
 The Teague line of cases provides more helpful guidance. 
Drawing on Teague, we hold that an affirmative answer to the first
section 2254(d)(1) inquiry whether the Supreme Court has
prescribed a rule that governs the petitioner's claim requires
something more than a recognition that the Supreme Court has
articulated a general standard that covers the claim. To obtain
relief at this stage, a habeas petitioner must show that Supreme
Court precedent requires an outcome contrary to that reached by the
relevant state court. Cf. Neelley, 138 F.3d at 923-24.
 We caution that this criterion should not be applied in
too rigid a manner. A petitioner need not point a habeas court to
a factually identical precedent. Oftentimes, Supreme Court
holdings are "general" in the sense that they erect a framework
specifically intended for application to variant factual
situations. These rules sufficiently shape the contours of an
appropriate analysis of a claim of constitutional error to merit
review of a state court's decision under section 2254(d)(1)'s
"contrary to" prong. Not coincidentally, the Court's pre-AEDPA
habeas case law employed this approach in conducting Teague "new
rule" inquiries, see Wright, 505 U.S. at 309 (Kennedy, J.,
concurring) ("Where the beginning point is a rule . . . designed
for the specific purpose of evaluating a myriad of factual
contexts, it will be the infrequent case that yields a result so
novel that it forges a new rule, one not dictated by precedent."),
and other federal courts have followed this praxis (wisely, we
believe) when construing section 2254(d)(1), see, e.g., Neelley,
138 F.3d at 923-24; Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir.
1996), cert. denied, 117 S. Ct. 1329 (1997).
 We recognize that determining whether "contrary to"
review is appropriate will prove difficult in some cases. Still,
the key inquiry, at bottom, is whether a Supreme Court rule by
virtue of its factual similarity (though not necessarily
identicality) or its distillation of general federal law precepts
into a channeled mode of analysis specifically intended for
application to variant factual situations can fairly be said to
require a particular result in a particular case.
 If no Supreme Court precedent is dispositive of a
petitioner's claim, then, a fortiori, there is no specific rule to
which the state court's decision can be "contrary." In such
circumstances, a federal habeas court then determines whether the
state court decision reflects an unreasonable application of
clearly established Supreme Court jurisprudence. This reduces to
a question of whether the state court's derivation of a case-
specific rule from the Court's generally relevant jurisprudence
appears objectively reasonable.
 To the extent that inferior federal courts have decided
factually similar cases, reference to those decisions is
appropriate in assessing the reasonableness vel non of the state
court's treatment of the contested issue. We think it is pellucid,
however, that the "unreasonable application" clause does not
empower a habeas court to grant the writ merely because it
disagrees with the state court's decision, or because, left to its
own devices, it would have reached a different result. Rather, for
the writ to issue, the state court decision must be so offensive to
existing precedent, so devoid of record support, or so arbitrary,
as to indicate that it is outside the universe of plausible,
credible outcomes. See Hall v. Washington, 106 F.3d 742, 748-49
(7th Cir. 1997); cf. Butler v. McKellar, 494 U.S. 407, 414 (1990)
(noting that the Teague rule evolved in an effort to uphold a state
court's "reasonable, good faith interpretations of existing
precedents").
 We realize that our distillation of section 2254(d)(1)'s
two-step analytic framework is at odds with decisions reached by
other courts. In the final analysis, however, we are duty bound 
in the absence of controlling precedent to exercise independent
judgment, and we have done so. We are confident that our work
product gives effect to all parts of the statutory provision,
comports with Congress's vision of habeas reform, and avoids the
artificial distinctions and syntactical pitfalls present in the
variant interpretations of the statute proffered by other courts
and commentators. Moreover, by eschewing undue deference to state
courts' decisions on federal law matters, our synthesis avoids an
interpretation that invites constitutional challenge.
III. APPLICATION OF THE STANDARD
 Using the analytic framework developed above, we evaluate
the claim that the trial judge's limitation on the scope of
recross-examination infracted the petitioner's constitutional
rights. To supply context, we briefly recapitulate the events
underlying this challenge. On redirect the prosecution first
elicited testimony that Shanahan was upset when she gave the police
a statement that contradicted her trial testimony in certain
respects. On recross, the petitioner's lawyer sought to question
Shanahan about the contents of a separate statement. Defense
counsel viewed this later statement as consistent with Shanahan's
original account to the police, inconsistent with her trial
testimony, and made at a time when the ostensible cause for her
discombobulation had abated. The trial judge ruled that questions
about the content of the second statement were beyond the scope of
redirect and therefore off-limits in recross.
 We begin with bedrock. The right of confrontation and
cross-examination "is an essential and fundamental requirement for
the kind of fair trial which is this country's constitutional
goal." Pointer v. Texas, 380 U.S. 400, 405 (1965). Supreme Court
jurisprudence makes it abundantly clear that the Confrontation
Clause effectuates this right by guaranteeing a criminal defendant
an opportunity to cross-examine witnesses effectively. See Davisv. Alaska, 415 U.S. 308, 315-16 (1974). Still, the right of cross-
examination is not unfettered. See Delaware v. Fensterer, 474
U.S. 15, 20 (1985) (emphasizing that a defendant does not have the
right to "cross-examination that is effective in whatever way, and
to whatever extent, the defense might wish"). When contemplating
restrictions on cross-examination, a trial court must strike a
constitutionally acceptable balance: although the court possesses
considerable discretion to preclude repetitive, irrelevant,
cumulative, or harassing interrogation, see Delaware v. Van
Arsdall, 475 U.S. 673, 679 (1986), it must not narrow the scope in
such a way as to preclude a defendant either from meaningfully
"delv[ing] into the witness' story to test the witness' perceptions
and memory" or from impeaching the witness, Davis, 415 U.S. at 316.
 We discern no rule in the Court's Confrontation Clause
jurisprudence that governs the petitioner's claim of error. None
of the Court's pronouncements flesh out its very general treatment
of cross-examination rights, either by way of a more refined rule
specifically intended for application to variant factual contexts
or by way of a fact-specific rule that governs recross-examination. 
There being no clearly established Supreme Court law to which the
SJC's decision is "contrary," we must evaluate the petitioner's
claim under the "unreasonable application" clause of section
2254(d)(1).
 All seven justices of the SJC joined in declaring that a
criminal defendant has a Sixth Amendment right to recross-
examination if such questioning attends a new matter elucidated for
the first time on redirect examination. See O'Brien, 645 N.E.2d at
1174; see also id. at 1178 (O'Connor, J., dissenting) (agreeing
with this aspect of the majority opinion). This holding is
eminently reasonable. It accords with the unanimous opinion of the
federal appellate courts that have applied the general precepts of
Davis and its progeny in a recross-examination context. See United
States v. Ross, 33 F.3d 1507, 1518 (11th Cir. 1994); United Statesv. Baker, 10 F.3d 1374, 1404 (9th Cir. 1993); United States v.
Riggi, 951 F.2d 1368, 1375 (3d Cir. 1991); United States v. Caudle,
606 F.2d 451, 457-58 (4th Cir. 1979); United States v. Morris, 485
F.2d 1385, 1387 (5th Cir. 1973). No other understanding of the
Confrontation Clause's application to recross-examination would be
objectively reasonable.
 The crucial inquiry, then, is whether the SJC effected
"an unreasonable application of clearly established Federal law"
when it upheld the trial court's decision to cut off the specific
questions that the petitioner's attorney sought to pose to Shanahan
about a second statement during recross-examination. To answer
that question, we independently review whether the material raised
by the prosecution was "new matter" requiring cross-examination
under the Sixth Amendment.
 This is not a simple matter. Although the general rule
is widely espoused, the case law contains little if any analysis of
what does (and does not) comprise a "new matter." In the absence
of authoritative guidance, the SJC reasoned that, on redirect, the
prosecution "sought to explain the circumstances surrounding the
making of a statement which had been used to impeach the witness on
cross-examination," and therefore, that questions about a second
statement "not brought out at any point on direct, cross, or
redirect examination" were beyond the scope of the redirect. 
O'Brien, 645 N.E.2d at 1174. The SJC also noted that the
petitioner could have entered Shanahan's second statement into
evidence during the initial round of cross-examination to buttress
the argument that her trial testimony was incorrect. See id.
 The other pan of the scale is by no means empty. The
petitioner, ably represented, argues that the SJC majority's view
of the redirect is overly cramped. He asseverates, as did the
dissenting justices, that the "material new matter which was
brought out for the first time on redirect was not [Shanahan's]
second statement, but was [her] upset state of mind when she gave
her first statement, brought out to reduce that statement's
impact." Id. at 1178 (O'Connor, J., dissenting). On this
appraisal, the contents of the second statement were relevant to
countering the prosecution's "mental state" initiative and thus
within the scope of redirect.
 We regard the question as a close one but, under
AEDPA's newly minted standard of review, the very closeness of the
call militates strongly against the granting of habeas redress. 
After thoroughly reviewing the trial transcript we deem both sides'
positions on the scope of the prosecution's redirect as quite
plausible. Accordingly, in the absence of contrary Supreme Court
authority, we cannot say that the SJC's conclusion is so offensive
to existing precedent, so devoid of record support, or so arbitrary
as to indicate laxity in addressing the petitioner's claim of
error. Hence, there was no unreasonable application of clearly
established Supreme Court precedent.
IV. CONCLUSION
 We need go no further. In enacting AEDPA, Congress
altered federal habeas corpus procedure in significant respects. 
We believe that our conception of section 2254(d)(1)'s standard of
review provision is faithful to the statute's language, honors
Congress's intent, and does not diminish the proper constitutional
role of the federal judiciary. Applying this framework, the
Massachusetts courts' resolution of the petitioner's claim of
constitutional error passes muster: the SJC's decision is neither
contrary to, nor an unreasonable application of, clearly
established law (as determined by the Supreme Court of the United
States). Consequently, the district court correctly dismissed
O'Brien's habeas petition.

Affirmed.